Argued March 22, reargued July 16, modified October 1, 1920, argued on rehearing February 28, former opinion modified and decree appealed from affirmed, May 31, 1922.

## GREENFIELD v. CENTRAL LABOR COUNCIL.

(192 Pac. 783; 207 Pac. 168.)

**Injunction — Burden on Complaining Employer to Prove Picketing Unlawful.**

1. In suit by an employer to enjoin labor unions from picketing, the burden is on plaintiff to prove, by a preponderance of the evidence, that the picketing was not done in a peaceful or lawful manner.

**Injunction—Relation of Employer and Employee and Conditions of Employment Continued to Exist After Strike Called.**

2. Relation of employer and employee, and terms and conditions of employment of shoe clerks by proprietor of retail store, *held* to have continued to exist after strike was called by the local union of shoe clerks, to bring the case under Sections 2 and 3, page 614, Laws of 1919, prohibiting injunction in cases between employer and employee growing out of a dispute concerning terms or conditions of employment, etc.

———————

On constitutionality of statutes restricting remedy by injunction in labor disputes, see note in L. R. A. 1916F, 836.

On law as to picketing, see notes in 13 Ann. Cas. 60; Ann. Cas. 1918E, 54; 4 L. R. A. (N. S.) 302; 50 L. R. A. (N. S.) 412.

**Injunction — Statute Prohibiting Injunction in Certain Cases Between Employer and Employee Constitutional.**

3. Sections 2 and 3, page 614, Laws of 1919, prohibiting injunction in cases between employer and employee growing out of dispute concerning terms or conditions of employment, *held* constitutional.

**Injunction—Union Entitled to Notify Members That Storekeeper was Unfair.**

4. Where retail shoe store owner signed agreement with Clerks' Union, but broke the contract, strike by the Clerks' Union was legally justified, and it, its members, and a central labor council had a legal right to notify union members the storekeeper was unfair to organized labor, that being done by pickets in a peaceful and lawful manner, and damage to the storekeeper was *damnum absque injuria.*

### ON REHEARING.

**Injunction—Never Issued Except to Prevent Irreparable Injury.**

5. Independently of, as well as under Section 2, page 614, Laws of 1919, injunction is never issued except to prevent irreparable injury.

**Injunction — Issuance in Labor Dispute Inhibited Only Where Means of Persuasion are Peaceful and Lawful.**

6. Section 3, p. 614, Laws of 1919, inhibiting injunction against soliciting others by peaceful or lawful means to cease patronizing a party to a dispute concerning terms or conditions of employment, is by its plain terms applicable only where the means are peaceful and lawful.

**Constitutional Law—Statute to be so Construed as to be Constitutional.**

7. When possible a statute is to be so construed as to make it square with state and federal Constitutions.

**Constitutional Law—Courts Open to All on Like Terms.**

8. It is fundamental that courts are open to all on like terms.

**Injunction—Picketing Held Unlawful.**

9. For pickets to take their stand at store entrances, or to patrol in front thereof, so as to cause the entrances to be somewhat obstructed, and during all business hours to call out in loud tones, denouncing the proprietor, advising all not to buy from him, thus causing annoyance and substantial loss, is unlawful, and none the less because of the existence of a strike, so that injunction properly issues notwithstanding Laws of 1919, page 614, Section 3.

**Injunction—Right to Follow Lawful Business Without Illegal Interference Protected.**

10. It is as much the duty of a court of equity to protect a man's right to follow his lawful business without illegal interference as to grant injunctive relief to prevent destruction of his physical property.

From Multnomah: JOHN McCOURT, Judge.

In Banc.

At the times alleged the plaintiff was, and now is, engaged in operating two retail stores for the sale of boots and shoes, one at the corner of Fourth and Alder Streets, and the other at the corner of Fourth and Morrison Streets, in the City of Portland. The defendant Local Union No. 1257 of the Retail Clerks' International Protective Association is an organized, but unincorporated union known as a laborers' union, with a constitution, rules, and regulations, and a president, secretary and business agent as officers. The members thereof are men and women employed as retail shoe clerks, some of whom prior to January 19, 1920, were employed by the plaintiff in his stores. The Central Labor Council of Portland is a body of delegates appointed by and representing numerous labor unions, including the defendant Local Union No. 1257, with authority to decide all questions in respect to the conduct and actions of the several unions. The defendant Nickerson is president of that Council and E. J. Stack is its secretary.

It is alleged, in substance, that on and prior to January 19, 1920, the defendants formed a plan of federation and conspiracy, "with the purpose and object of injuring and destroying the business of plaintiff by preventing the customers of said plaintiff from entering into his two said places of business as aforesaid, and buying his said merchandise," and conspiring together to intimidate and annoy the customers about to enter plaintiff's said places of business by means of pickets, to stand in front of and near the two stores, on the sidewalk and in the streets, to parade in front of the entrances to the

stores, wearing banners or scarfs conspicuously displayed, and inscribed with the words, "Unfair to Organized Labor," to address his customers, warning and advising them not to patronize the plaintiff, as he was unfair to organized labor, and to use insulting, opprobrious and disgraceful language to his customers and his employees.

The complaint is in form and substance very similar to that in the Heitkemper case (99 Or. 1, [192 Pac. 765]), in which an opinion has this day been rendered, including an allegation of resultant loss of business and charging that the defendants are unable to respond in damages; that they will continue to picket plaintiff's places of business unless restrained by order of court, and that the plaintiff has no plain, speedy, or adequate remedy at law. The prayer is for an injunction restraining them from the commission of such alleged acts.

The defendants admit that they caused pickets to walk back and forth on the sidewalk near the curb in front of the plaintiff's stores; that they wore scarfs with the words mentioned inscribed thereon; and that such pickets announced to passers-by that the plaintiff was unfair to organized labor, and publicly advised "all friends of decent working conditions, hours and wages, and of organized labor, to refuse to patronize the plaintiff's stores or any of them because they were unfair and because plaintiff was unfair to organized labor, and to refuse such patronage until the plaintiff and his stores should become fair to organized labor." They deny any intimidation, or that they committed any unlawful acts, and allege that policemen were in constant attendance; that no one of the pickets was ever arrested, and that no complaint was filed against either

of them. They also deny any conspiracy, and allege that there was a trade dispute between the plaintiff and the defendants, and that the picketing was done and would continue to be carried on in a peaceful manner, as authorized by Chapter 346, Laws of 1919, set out at large in the opinion in the Heitkemper case.

As a further and separate defense it is then alleged that about March 1, 1919, the plaintiff entered into a written contract with defendant Local Union No. 1257 for a period of twelve months, by which he leased R. C. I. P. A. union card No. 8, wherein it was provided that:

"Parties of the second part [meaning plaintiff] agree to retain in their employ only members or those, if eligible, who will become members within fifteen days from the date of their employment, of Local No. 1257 Retail Clerks' International Protective Association."

The agreement contains further stipulations as to holidays, hours of labor, times for meals and payment for overtime, and concludes with the recital:

"That the interests of each shall be mutually taken care of and advanced, and that any violation of the foregoing stipulations shall be sufficient cause for surrender of the Union Store Card."

It was duly executed by the plaintiff and the defendant union. It is alleged that about November 15, 1919, the plaintiff violated, and ever since that date continues to violate, the agreement; that he required certain of his employees who were members of the union to work four hours a week overtime without additional compensation; that he refused to perform his contract to employ only such individuals as were eligible for membership in, and who would become members of said Local Union No. 1257 within

fifteen days from the date of their employment, or at all; that about January 13, 1920, the plaintiff wholly repudiated his contract, and declared that he would not recognize or deal with the said defendant union or its members, and sought, and still seeks, to destroy its organization; that by reason thereof pickets were employed to inform passers-by that there was a trade dispute between the plaintiff and the defendants, and to advise friends of the defendant to patronize merchants who would keep and perform their contracts; and that the plaintiff has since advised, and does now advise, his employees and others not to join the union and to resign and leave their membership therein.   The defendants declare that—

"If any injury arises to the plaintiff because of said picketing it is merely incidental in defendants' endeavor to benefit themselves by demonstrating to plaintiff and to such employers as are interested that the friends of organized labor will and do patronize employers who maintain fair and reasonable conditions of labor for their employees and who will and do deal collectively with them in business affecting the welfare of employers, employees, and the public generally."

It is also charged by the defendants that "the plaintiff used all means in his power to injure labor organizations generally and to prevent others from uniting with them"; and that he offered "to pay all expenses of picketing Meier & Frank's store of Portland, Oregon, for one week, if said local union would do so."

It was stipulated that the answer should be construed as an admission of the complaint in the following particulars:

"That the defendants will continue in like manner to picket the plaintiff's places of business described

in the complaint if they are not restrained from so doing by the injunction of this court.

"That by reason of said picketing plaintiff has suffered reduction in the amount of his sales of merchandise, and consequent damage.

"That defendants have no property exempt from execution."

Further, it was agreed that—

"All of the affidavits filed by the defendants upon the order to show cause why a preliminary injunction should not be granted during the pendency of this suit, together with the affidavit of Ben M. Hecht, filed this day, may be, and each of them shall be, considered as competent evidence offered by defendants upon the trial of this cause upon its merits. And plaintiff shall file affidavits of and as to the kind, nature, extent, and character of said picketing, and the court shall determine therefrom the character of said picketing. Said affidavits to be in lieu of evidence."

A reply was then filed denying all of the new matter in the answer, and alleging that—

"Said pickets were not placed in front of plaintiff's said places of business with the intent and for the purpose of benefiting said defendants and other union workmen or employees, but, on the contrary, were placed by defendants in front of plaintiff's said places of business for the sole purpose and with the sole intent of injuring plaintiff in his said business, and compelling plaintiff to recognize said union, and to deal with them contrary to his wishes in said matter."

A trial was had, and, based upon the pleadings and evidence, the court made the following material findings of fact—

"That plaintiff in the operation of his said two retail shoe stores, employed certain clerks or employees, and that all of the employees employed by plaintiff in his said shoe stores located at

Fourth and Alder Streets were members of said Local Union No. 1257, and that all of plaintiff's employees in his said store at Fourth and Morrison Streets were members of said Local Union No. 1257, save and except four of said employees; that on or about the fifteenth day of January, 1920, the defendants, and each of them, demanded of plaintiff that he cause the said four nonunion employees to join defendants' Local Union No. 1257, and that upon their failure or refusal so to join that plaintiff discharge said four employees; that plaintiff refused so to do; that thereupon said defendants, and each of them, threatened plaintiff with a strike of all of his union employees, and threatened to picket plaintiff's said places of business, all done for the purpose of coercing plaintiff to discharge said four nonunion employees.

"That plaintiff and defendant Local Union 1257 had entered into the contract set forth in paragraph II of defendants' further and separate answer, and that previous to the nineteenth day of January, 1920, plaintiff violated his said agreement by refusing to compel his said nonunion employees to join said local union or to discharge them from his employ; and, further, that there was a dispute between plaintiff and some of his employees concerning payment of overtime as provided in said contract."

It was also found, in substance, that on January 19, 1920, the defendants formed a plan of injuring the defendant's business by diverting his customers, and dissuading them from buying his merchandise, and agreed to intimidate and annoy the plaintiff, his employees and the customers about to enter his stores, by means of picketing; that the pickets paraded along the outer edge of the sidewalk in front of plaintiff's places of business, wearing banners or scarfs inscribed, "Unfair to Organized Labor, Local Union No. 1257"; that they addressed customers about to enter or depart from plaintiff's stores, saying: "This

place is unfair to organized labor. Please do not patronize it. Friends of union labor and all workingmen will not patronize this place. All others should not," and advised intending purchasers to go elsewhere, saying that they could buy footwear cheaper at union stores; that plaintiff's business was materially reduced thereby, to his great and irreparable loss and damage; and that the pickets interfered with the free and open access to his stores by customers. It was further found:

"That the purpose and intent of said plan and of said picketing so caused by defendants was to injure the plaintiff in his business, and that the injury to plaintiff therefrom is direct, purposeful, and intentional, and it is not merely the incidental result of defendants' lawful efforts to benefit themselves or their friends; and that the purpose and intent of said plan and said picketing was to intimidate and divert prospective customers from entering plaintiff's said stores, and from patronizing plaintiff, and to injure plaintiff in his business, and to cause and coerce plaintiff to comply with the demands of said defendants."

Based upon these findings, the court entered a decree enjoining and prohibiting the defendants from harassing, annoying or obstructing the plaintiff in any manner in the conduct of his business, intimidating any of his employees, obstructing or interefering with any customers entering or departing from his stores, by any kind of violence or threats to induce any customer to withhold or withdraw his patronage from plaintiff, or in any manner picketing his places of business, save and except that it would be lawful for defendants and they were permitted to employ two pickets during the business hours of each day, and to station one of said pickets in front of each

of plaintiff's stores; that the pickets should be allowed to wear the banner described, and to walk upon the outer edge of the sidewalk in front of plaintiff's stores; but they were prohibited and enjoined from making any declaration concerning the plaintiff or his places of business, from engaging in any argument or conversation concerning the strike or boycott or the merits thereof, from making any demonstration, or from taking any poses or making any gestures intended to divert or turn patrons from plaintiff's places of business. From this decree both parties appealed.                                    MODIFIED.

For appellant there was a brief with oral arguments by *Mr. Thomas G. Greene* and *Mr. John W. Kaste.*

For respondents there was a brief over the names of *Mr. W. S. U'Ren, Mr. Andrew M. Crawford* and *Mr. W. C. Campbell,* with an oral argument by *Mr. U'Ren.*

JOHNS, J.—The vital question presented is the application, construction and constitutionality of Chapter 346, Laws of 1919, the material portions of which are copied in full in the companion case of *Heitkemper et al.* v. *Central Labor Council et al.*

1. The plaintiff is the moving party, and it was for him to prove by a preponderance of the evidence that the picketing was not done in a peaceful or lawful manner. His proof as to the manner and method of picketing appears from the affidavits of Frances Grant, I. M. Banks, E. H. Carpenter, H. W. Harper, E. L. Lynch, E. Weygandt, all of whom are employees of the plaintiff, and John L. Zingelmann, his

manager. It tends to show that the pickets spoke in a loud, blatant voice, "so as to be heard up and down the street by people entering into said store and by the customers in the store."

The defendants' proof of what the pickets said and the manner in which they spoke appears from the affidavits of a member of the defendant union, of W. H. Richardson, who is not a member of any union, L. D. Mahone, the pickets Frances Weaver, Mamie Cooper, C. C. Belieu, Mrs. Bertha Hart, Leona M. Stringer, and Theresa Pomeroy, and F. C. Preston, L. C. Novak, and Steve Woodford. From these declarations it would seem that the pickets did not in any manner annoy or disturb anyone entering or departing from plaintiff's stores or passing along the streets by them, or in any way disturb the general public; that the words were uttered in a respectful manner, distinctly but only loud enough to be heard by people passing along in front of the stores; and that it was all done "in a respectful and ladylike manner."

There were seven affidavits on the part of the plaintiff by individuals who were all in his employ, eleven on the part of the defendants by affiants who were members of the union or in its employ, and three affidavits for the defendants by individuals not shown to be connected with the union in any way. It will be noted that there is no independent declaration by anyone on the part of the plaintiff, and in so far as we are advised, all of the affidavits are entitled to equal weight. If it is a fact, as the statements in behalf of the plaintiff tend to show that "the voices of the pickets were loud, sometimes shrill and blatant," it would have been an easy matter to

procure some evidence of it from disinterested sources.

Although we agree with the trial court in its findings as to what the pickets said, yet, as we construe the record, they spoke in an ordinary tone of voice and not in a loud or unusual manner. Policemen were present and there is no evidence of any complaint or arrests, or that there was any violence or disturbance of the peace. In fact, the pickets were placed in front of each store for the sole purpose of advising people entering or departing therefrom that "this place is unfair to organized labor. Please do not patronize it. Friends of union labor and all workingmen will not patronize this place. All others should not." That was the sum and substance of their offending. The words were uttered in the usual and ordinary tone of voice used by people speaking to others on a public street.

The defendants claim that under Chapter 346, Laws of 1919, they had a legal right to do what was done. As stated, the contract between them and the plaintiff did not expire until March 1, 1920, and it was broken by the plaintiff on or about November 15, 1919. By the terms of that contract the union agreed to, and we must assume that it did, "advise all local organizations of the City of Portland and the State of Oregon" of the fact that the plaintiff had signed the agreement, wherein it was stipulated "by all parties that the interests of each shall be mutually taken care of and advanced." After the plaintiff broke his contract the defendants claimed that he was unfair to organized labor, and that so long as they acted in a peaceful and lawful manner they had a right to make that fact known, and to re-

quest the public in general, as well as the members of the union, not to patronize the plaintiff.

It is also shown by the affidavits of three of his employees that the plaintiff had violated his contract with them in respect to the payment for overtime, although this was denied by his manager. In other words, there was a dispute between an employer and employees growing out of an employment, within the terms and provisions of Chapter 346, Laws of 1919.

Because a strike was declared and the union employees walked out, plaintiff claims that the relation of employer and employee ceased to exist; that there was no longer any "dispute concerning terms or conditions of employment," wherefore Chapter 346, Laws of 1919, would not apply. Counsel have not cited and we have not found any authority which sustains that contention, and where that question has been decided the authorities are against it. On this point, Section 20 of the Clayton Act (38 Stats. at L. 738, U. S. Comp. Stats., § 1243d), is identical with Section 2 of Chapter 346, Laws of 1919.

In *Tri-City Central Trades Council et al.* v. *American Steel Foundries,* 238 Fed. 728 (151 C. C. A. 578), construing the Clayton Act, the Circuit Court of Appeals, Seventh Circuit, holds:

"A labor union, of which former employees engaged in a strike were members, is not a mere intermeddler, whose interference with other employees may be restrained, when only lawful means are used, since a strike does not fully terminate the relationship between the parties, but creates a relationship, neither that of general employer and employee, nor that of employers and employees seeking work from them as strangers."

The opinion there says:

"Neither strike nor lockout fully terminates during the strike the relationship between the parties."

In *Duplex Printing Press Co.* v. *Deering et al.,* 252 Fed. 722 (164 C. C. A. 562), the syllabus lays down the rule that:

"Where union employees of open shop go out on strike for closed shop, employer's action for injunction against officers and members of union organization to which strikers belong *held* within Clayton Act * * relating to granting of injunctions in cases growing out of dispute concerning conditions of employment."

In *Iron Molders' Union* v. *Allis-Chalmers Co.,* 166 Fed. 45 (91 C. C. A. 631, 20 L. R. A. (N. S.) 315), in his concurring opinion Mr. Justice GROSSCUP of the Circuit Court of Appeals, Seventh Circuit, says:

"A lockout is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lockout completely terminates, when this is its purpose, the relationship between the parties. * * Manifestly, then, pending a strike or a lockout, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor, again that of employer looking among strangers for employees, or employees seeking from strangers employment."

2. The contract between plaintiff and defendant union, as stated, did not expire until March 1, 1920. The strike was called on January 19, 1920. At that time, according to the finding of the trial court, all of the employees of the plaintiff at both of his stores, except four, were members of the defendant union. The complaint in this suit was filed on January 23, 1920. Based upon such facts, we hold that the rela-

tion of employer and employee and the terms and conditions of employment continued to exist after the strike was called, bringing the case under Sections 2 and 3 of Chapter 346.

Assuming that to be true, plaintiff contends that such sections are unconstitutional. Section 2 of Chapter 346 is identical with paragraph 1464, Ariz. Civ. Code of 1913, and with Section 20 of the Clayton Act. If it is unconstitutional, so are the two latter laws. The Clayton Act was passed in 1914. In so far as we are advised its constitutionality has never been attacked and no federal court has ever declared it unconstitutional. When we consider its history, why it was enacted, that it applies with equal force to every state in the Union, and that it has now been in existence for six years, the fact that its validity has never been impeached in the federal courts against which it was aimed becomes important and is worthy of serious consideration. For this court now to hold that Sections 2 and 3 of Chapter 346, Laws of 1919, are null and void would be, in legal effect, to declare Section 20 of the Clayton Act unconstitutional.

Again, Section 2 of Chapter 346 is identical with paragraph 1464 of the Ariz. Civ. Code of 1913, the constitutionality of which was sustained in the opinion of the supreme court of that state on December 14, 1918. Chapter 346 was enacted by the Oregon legislative assembly of 1919, and in the absence of the referendum, became the law of this state ninety days after its passage. In other words, at the time of its adoption, Section 2 of Chapter 346, which is a copy of paragraph 1464 of the Ariz. Civ. Code of 1913, had been construed and its constitutionality was sustained by a decision of the Supreme Court of Arizona.

The question was raised in the case of *Truax* v. *Corrigan*, 20 Ariz. 7 (176 Pac. 570), and the court held:

"Civil Code of 1913, paragraph 1464, authorizing injunction in case between employer and employee only when necessary to prevent injury to property right for which there is no adequate remedy at law, does not deny to employers, seeking injunction to restrain picketing, equal protection of law, or deprive them of the property without due process of law, under Const. U. S. Amendment 14; such statute not forbidding injunction to restrain unlawful acts, but merely throwing burden upon employer to prove that the picketing sought to be restrained is unlawful."

The opinion reads thus:

"It is quite clear that the statute recognizes the right of striking employees to carry on a campaign of picketing in furtherance of a strike for a lawful purpose, provided the means used, and the manner in which such means are used, are peaceable and otherwise violate no legal rights of the party whose premises are subjected to the picketing, and are not in violation of any duty owing by the striking employees to such party or to the public. In no sense can the statute be considered as one either depriving the plaintiffs of property without due process of law, or denying plaintiffs the equal protection of the law.

"The plaintiffs' property rights are not invaded by picketing, unless the picketing interferes with the free conduct of the business by the plaintiffs; and plaintffs do not claim that defendants have, by using violent means with picketing, invaded their rights in this respect, by causing a loss in business. If such nature of picketing should be charged and established by proof, plaintiffs would be entitled to relief to the extent of prohibiting the use of violence in any form. By the statute the plaintiffs are deprived of an order restraining peaceful, not violent, unlawful acts, and, to entitle a plaintiff to an order restraining violent unlawful acts, he is required to

set forth facts sufficient to constitute such acts as amount to unlawful acts, and sustain such complaint by substantial evidence. The statute conflicts with neither constitutional provision invoked."

In *State* v. *Finch*, 54 Or. 482 (103 Pac. 505), the opinion of Mr. Justice McBride holds:

"Another canon of construction is that, when a constitutional provision has been taken or copied from the Constitution of another state, after it has been construed by the courts of that state, it will be presumed to have been adopted with the construction placed upon it by the courts of the state where it originated."

The opinion of this court in *State* v. *Cochran*, 55 Or. 157 (104 Pac. 419, 105 Pac. 884), lays down the rule that the Constitution of a state, unlike that of the United States, is a limitation upon, and not a grant of power; that any law adopted by the legislature which is not prohibited by the Constitution must be sustained, and that the inhibition must appear expressly or impliedly, beyond a reasonable doubt.

3. Although there are portions of the opinion of the Supreme Court of Arizona that we do not approve, and the terms and provisions of Sections 2 and 3 of Chapter 346, Laws of 1919, may be close to the border line, yet under such rules of construction it is our duty to hold those sections of the act constitutional.

The remaining question is whether or not the picketing was done "by peaceful and lawful means."

In an exhaustive note to the case of *Re Langell*, 178 Mich. 305 (144 N. W. 841, 50 L. R. A. (N. S.) 412), we find:

"The decisions are not harmonious upon the question as to the legality of picketing *per se*, and

whether picketing as such should be enjoined irrespective of the question of actual violence or conduct attending the picketing calculated to intimidate. It may be said, however, that the majority of the cases cited in the present, as well as in the earlier, note, recognize, or at least do not deny, that picketing may be lawful in some circumstances; in other words, hold or concede that picketing is not unlawful *per se* and should not as such be enjoined; although there is discernible a growing tendency to accept the contrary view adopted in *Re Langell,* upon the ground that, as a practical matter, there can be no such thing as peaceable picketing, especially where there are a considerable number of pickets.''

Numerous authorities *pro* and *con* are collated, but the opinion was rendered on January 5, 1914, and all the cases it cites were decided prior to the passage of the Clayton Act. Neither of them is founded upon that or any similar statute, but, in the absence of such a law, the weight of authority seems to be in favor of limiting and restricting peaceful picketing. In *Duplex Printing Press Co.* v. *Deering et al.* (D. C.), 247 Fed. 192, decided by the United States District Court for the Southern District of New York on April 23, 1917, it is held:

''That the object of such action [picketing and boycott] by defendants was lawful, and that, in the absence of evidence that unlawful means were resorted to for its accomplishment, the fact that defendants' acts resulted in injury to complainant's business did not authorize the granting of an injunction by a federal court under Clayton Act.''

Quoting again from the opinion in *Tri-City Central Trades Council* v. *American Steel Foundries,* 238 Fed. 733 (151 C. C. A. 583), it is said:

''Indeed the very act of striking often seriously interferes with that free and unrestrained control and operation of the employer's business, which the

plaintiff here alleges as an object of the conspiracy charged; but the lawfulness or unlawfulness of the strike is not to be tested by such incidental effect of it. And so it is with persuasion and picketing, properly carried on in the interests of a lawful strike. The laborer may be strictly within his rights, although he obstructs 'the free and unrestrained control and operation of the employer's business.' The right to strike must carry with it, by implication, the right to interfere with the employer's business to a certain extent. The right to persuade prospective employees by legitimate argument must of necessity interfere with the employer's business. Where labor is essential to the successful conduct of a business, any interference with that labor is an interference with the employer's business. But, whether the interference with the business is lawful or unlawful depends upon the facts in each case."

On this point we find the following statement in *Iron Molders' Union* v. *Allis-Chalmers Co.*, 166 Fed. 45, 49, 51 (91 C. C. A. 631, 635, 637, 20 L. R. A. (N. S.) 315):

"The parts of the decree which prohibit the use of persuasion and picketing can be justified only on the basis that such means are not lawfully to be applied in a genuine struggle of labor to obtain better terms and conditions; for surely men are not to be denied the right to pursue a legitimate end in a legitimate way, simply because they may have overstepped the mark and trespassed upon the rights of their adversary. A barrier at the line, with punishment and damages for having crossed, is all that the adversary is entitled to ask. * *

"With respect to picketing as well as persuasion, we think the decree went beyond the line. The right to persuade new men to quit or decline employment is of little worth unless the strikers may ascertain who are the men that their late employer has persuaded, or is attempting to persuade, to accept employment. Under the name of persuasion,

duress may be used; but it is duress, not persuasion, that should be restrained and punished. In the guise of picketing, strikers may obstruct and annoy the new men, and by insult and menacing attitude intimidate them as effectively as by physical assault. But from evidence it can always be determined whether the efforts of the pickets are limited to getting into communication with the new men for the purpose of presenting arguments and appeals to their free judgments. Prohibition of persuasion and picketing, as such, should not be included in the decree."

It is true that, notwithstanding the provision of the Clayton Act, injunctions were granted in the cases of *Stephens* v. *Ohio State Telephone Co.* (D. C.), 240 Fed. 759, and *Alaska S. S. Co.* v. *International Longshoremen's Assn. of Puget Sound et al.* (D. C.), 236 Fed. 964. Both of these decisions are founded upon important and vital facts from which it clearly appears that there was an *unlawful* conspiracy by the defendants to do *unlawful* acts; that their methods and conduct were neither lawful nor peaceful; and that there were breaches of the peace and continued acts of violence. In the first case, the telephone company was a public service corporation; and in the second, the steamship company was engaged in carrying United States mail. For such reason neither of them is in point here.

The word "unfair" is used by the pickets in defendants' employ is thus defined by the opinion in *Parkinson Co.* v. *Building Trades Council,* 154 Cal. 581 (98 Pac. 1027, 16 Ann. Cas. 1165, 21 L. R. A. (N. S.) 550).

"In reference to the word 'unfair,' it clearly appears that, as employed by the defendants and labor organizations generally, it has a technical meaning

well understood by the plaintiff and by all the persons to whom the council sent notices that plaintiff had been declared unfair. Such declaration means, and in this instance was understood by all the parties concerned to mean, not that the plaintiff had been guilty of any fraud, breach of faith, or dishonorable conduct, but only that it had refused to comply with the conditions upon which union men would consent to remain in its employ or handle material supplied by it."

*Roraback* v. *Motion Picture Machine Operators Union*, 140 Minn. 481 (168 N. W. 766, 169 N. W. 529, 3 A. L. R 1290), lays down the rule that:

"Men, either singly or in combination, may use any lawful means to accomplish a lawful purpose, although the means adopted may cause injury to another; but they may not intentionally injure or destroy the business of another to accomplish an unlawful purpose."

We find the following in 16 R. C. L., page 432, section 15:

"In the former case the test as to the lawfulness of concerted action is whether there is any lawful object or purpose common to such persons which that course of conduct is reasonably and fairly calculated to promote, and whether they act in good faith, for the primary purpose of promoting that object, or willfully, for the primary purpose of injuring another. * *

"In view of what has already been stated, there can be no doubt that the facts of a labor combination directed solely for the betterment of the condition of the workingmen is a worthy, and therefore not an unlawful, purpose. This applies even to acts which a labor organization has only a qualified right to do. * * [Page 432, Section 16.]

"The decision of the question whether 'picketing' is lawful or unlawful depends upon the circumstances surrounding each case. * * [Page 454, Section 33.]

"The persuasion used by employees need not be confined to members of their organization or to other workmen; they may take proper measures to induce third persons to withhold their patronage from their employer, in order to compel him to recognize their demands. But, as has already been intimated, they must not coerce and intimidate the employer's customers into severing their relations with him. There is, however, difference of opinion as to what constitutes such coercion. The mere fact that the employer's customers are induced not to purchase goods from him for fear of incurring the ill will of the members of the union has been held not to render unlawful the act of the members of the union. * * [Page 455, Section 34.]

"However, as members of a labor union have the right to strike, they also have the right, either by speech or writing, to give notice of their intention so to do, and, having lawfully gone on a strike, they have the right to give notice of the strike, as a matter of news, or to anyone interested therein. In other words, the mere fact that a person dependent on the public for patronage is having a controversy with labor which will injure him in that patronage if generally known, does not entitle him to be protected from that injury by restraining the dissemination of the fact among his patrons that he is engaged in such a controversy." [Page 457, Section 35.]

4. By the terms of the contract, the defendant union had notified all members of labor unions that the plaintiff had signed an agreement with it, and in effect that he was "fair to organized labor." After plaintiff broke the contract, the strike became and was legally justified, and the defendants then had, at least, the legal right to notify members of the union that he was "unfair to organized labor." It was a justifiable strike for a lawful purpose, and,

104 Or.—17

as we construe the record, it was done in a peaceful and lawful manner. It was called because the plaintiff breached his contract, and to further and protect the interests of the union and its members. Any damage to plaintiff therefrom was incidental to the strike and was *damnum absque injuria.*

The decree of the Circuit Court will be modified, and one will be entered here permitting the defendants during business hours to place and maintain one picket only, on the outer edge of the sidewalk, at each public entrance to plaintiff's stores, with authority to each picket to wear a banner or scarf inscribed with the words, "Unfair to Organized Labor, Local Union No. 1257," and in the usual, ordinary tone of voice used by one individual in addressing another on the public street to say to any prospective customer:

"This place is unfair to organized labor. Please do not patronize it. Friends of union labor and all workingmen will not patronize this place,"

but not in any manner to impede or interfere with the right of anyone to enter or depart from the said stores, or any passer-by. Any picket so placed is hereby enjoined from the doing of any other act or thing which is intended to or would. divert or turn away any patron or prospective customer from plaintiff's places of business. Otherwise the defendants and each of them, their agents, servants and employees, are hereby enjoined and prohibited from interfering with, intimidating or harassing the plaintiff or any of his employees at his said places of business, or from the use of any violence, threat or intimidation to induce any customer or patron to withhold or withdraw patronage from the plaintiff.

For the reason stated in the Heitkemper case, neither party shall recover costs in this or the Circuit Court. MODIFIED. DECREE ENTERED.

McBRIDE, C. J., and BEAN, BENSON and HARRIS, JJ., concur in the result.

BURNETT, J., dissents.

BENNETT, J., Specially Concurring.—I concur in the reasoning and general result reached in the opinion of Mr. Justice JOHNS in this case, but I think the limitation on the number of pickets is too narrow. On principle, as shown in Mr. Justice JOHNS' opinion, the right of the defendants to solicit and persuade plaintiff's customers in a peaceable manner to withhold their patronage ought not to be limited except to prevent physical interference with the ingress and egress of customers.

In this case the pickets were ladies. We should and must assume that these young women are just as modest and ladylike as average women, and it would be unnecessarily embarrassing to restrict them so that they would be compelled to act alone. I see no necessity or just reason for so narrow a limitation.

———

Former opinion modified on rehearing May 31, 1922.

ON REHEARING.

(207 Pac. 168.)

MODIFIED AND DECREE APPEALED FROM AFFIRMED.

This is a suit in equity, involving a controversy with union labor. The plaintiff, Geo. L. Greenfield,

sought, and was decreed, protection by injunction. The plaintiff is a merchant of Portland, conducting two retail stores for the sale of boots, shoes and other footwear, his places of business being located at the northeast corner of Fourth and Alder Streets and the northwest corner of Fourth and Morrison streets respectively.

The defendant Local Union No. 1257 of the Retail Clerks' International Protective Association, is a trade union. Defendant John Doe Preston is the business agent of this union. Defendants L. C. Novak and J. D. Myall are its secretary and president respectively. Defendant Central Labor Council of Portland and vicinity is a body of delegates appointed by, and representing, numerous labor unions and organizations, including the defendant Local Union No. 1257, and has authority conferred upon it by the several unions to aid, assist, promote, counsel and advise such labor unions, including the defendant Local Union No. 1257, in respect to the conduct and acts set forth in the pleadings.

The facts offered and received in evidence in the trial of the cause were brought before the court by the pleadings, stipulations of counsel, and affidavits. From the evidence adduced upon the trial, the court made its findings of fact, from which it deduced, as a conclusion of law, that the plaintiff was entitled to relief by the extraordinary process of injunction.

Based thereon, the court made and entered the following decree:

"That said defendants, and each of them, their servants, agents, officers, employees, members and attorneys, be, and they are hereby enjoined and prohibited from in anywise interfering with, or harassing, or annoying, or obstructing plaintiff in the con-

duct of his business, to wit: his retail shoe stores known as 'Greenfield's,' situated at the northwest corner of Fourth and Morrison Streets, and 'Wright's Sample Shoe Shop,' situated at the northeast corner of Fourth and Alder Streets, both in the city of Portland, Oregon; and from in anywise molesting, interfering with, intimidating, threatening, or harassing any employee or employees of plaintiff in said business and from intimidating, harassing, annoying, interfering with, or obstructing any customer or customers, patron or patrons of plaintiff from entering into, or departing from plaintiff's said places of business; and by any kind of violence, threats, or intimidation, inducing or seeking to induce any customer or customers, patron or patrons, or intending customers or patrons to withhold or withdraw their patronage from plaintiff, or to refrain from entering into plaintiff's said places of business, and further said defendants, and each of them, their agents, servants, employees, members and officers, are hereby prohibited and enjoined from in anywise or manner picketing the said places of business of plaintiff, save and except that it shall be lawful, and the defendants are hereby permitted to employ two pickets during the business hours of each day, and to station one of said pickets in front of each of plaintiff's said stores, and said pickets may be permitted to wear upon their person, a sash inscribed with the words: 'Unfair to organized labor, Local Union 1257,' and said pickets are permitted to walk upon the outer edge of the sidewalk in front of plaintiff's said places of business, but said pickets are prohibited and enjoined from making any declaration, or statements, whatsoever, concerning plaintiffs or his said places of business, and said pickets are enjoined and prohibited from engaging in any argument or conversation of any kind with any person concerning the strike, or boycott declared against plaintiff, or concerning the merits thereof, and said pickets are further enjoined and prohibited from making any demonstration of any kind whatsoever, or from taking any

poses or making any gestures calculated or intended to divert or turn patrons or prospective customers from plaintiff's said places of business. * * ''

The plaintiff appeals from that part of the decree reading:

"Save and except that it shall be lawful, and the defendants are hereby permitted, to employ two pickets during the business hours of each day, and to station one of said pickets in front of each of plaintiff's said stores, and said pickets may be permitted to wear upon their persons a sash inscribed with the words, 'Unfair to organized labor, Local Union 1257,' and said pickets are permitted to walk upon the outer edge of the sidewalk in front of plaintiff's said places of business'';

and asserts that all picketing is an unlawful invasion of a property right and constitutes a continuous trespass; second, that all picketing, whether peaceful or otherwise, is a means employed by men acting in concert and in furtherance of a conspiracy to do an unlawful act.

The defendants appeal, assigning error in Finding of Fact No. Seven, wherein the court found:

"That the defendants had formed a plan or carried out by concert of action, or otherwise, a plan or purpose of intimidating or annoying the plaintiff or his employees, or to intimidate or annoy the customers about to enter into plaintiff's said places of business, or any of said customers, by means of pickets or otherwise.

"And, further, the court erred in * * finding that many of the plaintiff's customers were * * prevented and intimidated from patronizing plaintiff's stores during * * the time of said picketing, and that thereby the trade of plaintiff in his retail business was materially reduced, to his * * irreparable loss and damage; and that said picketing as thus conducted by defendants obstructed the entrances to plaintiff's said places of business, and obstructed

and interfered with the free and open access to plaintiff's said places of business by his patrons * * .

"That the court erred in its conclusions of law that the picketing as conducted by defendants is unlawful * * and in all that portion of the decree, except only wherein the court enjoined the defendants, and each of them, from, 'by any kind of violence, threats or intimidations, inducing or seeking to induce, any customer or customers, patron or patrons, or intending customers or patrons, to withhold or withdraw their patronage from plaintiff, or to refrain from entering into plaintiff's said places of business.' "

FORMER OPINION MODIFIED AND DECREE APPEALED FROM AFFIRMED.

For plaintiff-appellant there was a brief over the names of *Mr. John W. Kaste* and *Messrs. Bauer, Greene & McCurtain,* with an oral argument by *Mr. Kaste.*

For defendants-appellants there was a brief over the names of *Mr. W. S. U'Ren, Mr. A. M. Crawford* and *Mr. W. C. Campbell,* with an oral argument by *Mr. U'Ren.*

BROWN, J.—There is no serious conflict in the evidence concerning the material facts relating to the strike. There is, however, a dispute as to the manner in which the pickets addressed plaintiff's customers and others.

After careful consideration of the record, we adopt the findings of fact made by the trial court and set forth below, as supported by the evidence. The facts so found and adopted are as follows:

In conducting his business as a retail dealer in boots and shoes, the plaintiff employed a number

of clerks, all of whom were members of Local Union No. 1257 excepting four.

About January 15, 1920, the defendants demanded that Greenfield, the plaintiff, require the four non-union men in his employ to join Local Union No. 1257, and insisted that if they should fail or refuse to become members of the union, plaintiff should discharge them. This the plaintiff refused to do. Thereupon, the defendants, for the purpose of coercing plaintiff to discharge his nonunion clerks, threatened him with a strike, including the picketing of his stores.

The plaintiff and defendant Local Union had previously entered into a contract set forth in defendant's further and separate answer, which was violated by the plaintiff when he refused to compel his nonunion employees to join the union, or to discharge them from his employ. There was also a dispute between plaintiff and some of his employees concerning the payment of overtime provided for in that contract.

In carrying out their threats, the defendants entered into an agreement to be executed by concert of action, having for its purpose the injuring of the business of the plaintiff by preventing his customers from dealing with him. In order to influence persons from trading with plaintiff, it was agreed to annoy him, his clerks, as well as customers and prospective patrons, by means of pickets, who were to parade along the outer edge of the sidewalk in front of the entrances to his stores. This agreement was carried out. The pickets, wearing about their shoulders scarfs, with the words, "Unfair to organized labor, Local Union No. 1257," inscribed thereon in large letters, patrolled the sidewalk in

front of plaintiff's stores, or, took their stand in front of such stores, and, in a loud tone of voice, declared to the customers who were about to enter, or who did enter and depart from the stores:

"This place is unfair to organized labor; please do not patronize it; friends of union labor and all workmen will not patronize this place, all others should not."

While parading to and fro on the sidewalk in front of the plaintiff's stores, and while standing on the walk in front thereof, the pickets urged would-be customers to go elsewhere to purchase footwear, asserting that they could purchase such goods cheaper at union stores than at plaintiff's. To patrons departing from plaintiff's stores, the pickets would say:

"That's all right.   Go in and bother them all you want, just so you don't buy anything."

The court found that the picketing obstructed the free and open access to the stores of plaintiff; that many of the plaintiff's customers were prevented and intimidated from trading with him during the time of the picketing, and the amount of his sales materially reduced, to his great and irreparable loss and damage; that the defendants inflicted direct and intentional injury upon the plaintiff's business, and that such injury was not the incidental result of defendants' lawful efforts to benefit themselves or their friends.

The court further found that defendants would continue so to picket plaintiff's places of business, unless restrained; that the defendants were insolvent, and that "plaintiff has no plain, speedy or adequate remedy at law."

The defendants not only put the plaintiff upon his proof, but also invoke in their defense the provisions of Chapter 346, General Laws of Oregon, 1919 (Sections 6814–6819, Or. L.). The main point in the case lies in the construction to be placed upon this statute. Defendants admit that they were picketing plaintiff's stores, but assert, in effect, that all they did, or caused to be done, was authorized by the terms of this act, and that if any damage resulted therefrom to plaintiff, such injury was only incidental to the lawful conduct of defendants legalized by the act.

Sections 2 and 3 of this chapter are practically the same as Section 1464 of the Revised Statutes of Arizona, 1913, and Section 20 of the Clayton Act (October 15, 1914), 38 Stats. at L. 738, Chapter 323, Comp. Stats., Section 1243d, 6 Fed. Stats. Ann. (2 ed.), p. 141.

Section 1 of Chapter 346, General Laws of Oregon, 1919, provides that workmen may organize themselves into, or carry on, labor unions, for the purpose of lessening the hours of labor, or increasing the wages, or bettering their conditions. This is but a declaration of the law as it existed in this commonwealth prior to the enactment of the statute.

5. Section 2 of the act prohibits the granting of an order of injunction in any case between an employer and an employee, or between persons employed and persons seeking employment involving or growing out of disputes concerning terms or conditions of employment, unless necessary to prevent irreparable injury to property or to a property right of the party making the application, for which injury there is no adequate remedy at law. That is another declaration of the law as it existed long

prior to the enactment of the statute in question.

Great care should always be exercised by the court in issuing a writ of injunction in a controversy of this character. It is an elementary principle of equity that an injunction is never issued, except to prevent irreparable injury.

This court, in the case of *Longshore Printing Co.* v. *Howell,* 26 Or. 527, 554, 555 (38 Pac. 547, 46 Am. St. Rep. 640, 28 L. R. A. 464), approved the following statement of the law by BALDWIN, J., in *Bonaparte* v. *Camden,* Baldw. 205 (Fed. Cas. No. 1617):

"There is no power, the exercise of which is more delicate, which requires greater caution, deliberation, and sound discretion, or is more dangerous in a doubtful case, than the issuing of an injunction. It is the strong arm of equity, that never ought to be extended unless to cases of great injury, where courts of law cannot afford an adequate or commensurate remedy in damages. The right must be clear, the injury impending or threatened, so as to be averted only by the protecting preventive process of injunction; * * It will be refused till the court is satisfied that the case before them is of a right about to be destroyed, irreparably injured, or that great and lasting injury is about to be done by an illegal act. In such a case the court owes it to its own suitors and its own principles to administer the only remedy which the law allows to prevent the commission of such act."

6. That portion of Section 3 of the act material to this case provides:

"That no restraining order or injunction shall prohibit any person * * from ceasing to patronize any party to such dispute; or from recommending, advising or persuading others by peaceful or lawful means so to do."

This provision of the statute enacts no legal principle. If the defendants have adopted peaceful and

lawful means in the persuasion of others not to patronize Greenfield, an injunction does not lie. It was the fact that the acts of the defendants were not deemed peaceful and lawful that led the court to issue its restraining order.

7. The language of the statute is plain. The words are to be given their ordinary meaning. It was the intention of the law-making body to pass a valid and constitutional act. It is our duty, whenever possible, so to construe a statute as to make it square with the state and federal Constitutions. This statute, however, could not be held valid, if intended and construed as a shield of protection for persons unlawfully engaged in the destruction of plaintiff's property rights.

8. It is a fundamental principle of law that courts are open to all on like terms.

In *Bogni* v. *Perotti,* 224 Mass. 152 (112 N. E. 853, L. R. A. 1916F, 831), the question of the constitutionality of a law prohibiting the issuance of injunctions in labor disputes was before the court. The first section of the Massachusetts Statute, 1914, Chapter 778, is like the second section of Chapter 346, General Laws of Oregon, 1919. The other sections are in substance similar to the Oregon law. In that case the court held that the right to labor was a property right, notwithstanding the legislative act, and was under the protection of the Fourteenth Amendment to the Constitution of the United States. The court said:

"That a man cannot resort to equity respecting his property right to work in the ordinary case simply because he is a laboring man, and that he cannot have the benefit of an injunction when such remedies are open freely to owners of other kinds of property, need scarcely more than a statement

to demonstrate that such a man is not guarded in his property rights under the law to the same extent as others.''

And, further,

''It is an essential element of equal protection of the law that each person shall possess the unhampered right to assert in the courts his rights, without discrimination, by the same process against those who wrong him as are open to every other person. The courts must be open to all upon the same terms. No obstacles can be thrown in the way of some which are not interposed in the path of others. Recourse to the law by all alike, without partiality or favor, for the vindication of rights and the redress of wrongs, is essential to equality before the law (citing numerous authorities).''

We have hereinbefore alluded to the fact that the Oregon statute under consideration is almost a duplicate of Section 20 of the Clayton Act.

Concerning the meaning of Section 20 of the Clayton Act, the court said, in the case of *Stephens* v. *Ohio State Telephone Co.*, 240 Fed. 759, 770, 773, 774:

''The second paragraph of Section 20 we quote in full as the important one. It has sometimes been called 'Labor's Bill of Rights.' We may as well call it an 'Employer's Bill of Rights,' and also, when there is a labor controversy involving a public utility as here, the 'Public's Bill of Rights.' The 'rights' guaranteed by it to the employees, 'in any case between employer and employees,' are to be set up against and limited by the certain 'rights' of the employer therein written. He has just as much right, under this section, that his employees shall not exceed the limits of their rights under it as they have to enjoy them. The rights of the employer begin where those of the employees stop. The granting of a 'right' by statute always involves an obligation upon the favored one not to exceed its limitations. The act says:

" 'And no such restraining order or injunction shall prohibit any person or persons, whether singly or in concert, from terminating any relation of employment, or from ceasing to perform any work or labor, or from recommending, advising, or persuading others by peaceful means so to do; or from attending at any place where any such person or persons may lawfully be, for the purpose of peacefully obtaining or communicating information, or from peacefully persuading any person to work or to abstain from working; or from ceasing to patronize or to employ any party to such dispute, or from recommending, advising or persuading others by peaceful and lawful means so to do; or from paying or giving to, or withholding from, any person engaged in such dispute, any strike benefits or other moneys or things of value; or from peaceably assembling in a lawful manner, and for lawful purposes; or from doing any act or thing which might lawfully be done in the absence of such dispute by any party thereto; nor shall any of the acts specified in this paragraph be considered or held to be violations of any law of the United States.'

"It is well to note, and not to lose sight of, the fact that the words 'lawfully,' 'peacefully,' 'lawful,' 'peaceful,' dominate the thought of the second paragraph of the section in question; they control its meaning, as they control both the court and the parties to a labor controversy. The statute but enacts the position which courts have universally taken; there is nothing new in it, for we hold that no case exists where a court has attempted jurisdiction to control lawful and peaceable action by injunction, although it may seem that sometimes judgment may have been faulty as to what particular action was 'unlawful' or provocative of a disturbed peace. * *

"Each case presents its own peculiar question. An act may be lawful and peaceful, or just the opposite, according to its setting. It is easier, and far more practicable, therefore, to deal in prohibitions than in affirmations. Broad generalizations, however,

are easily framed, because, if we just keep in mind the prevalence in the statute of the qualifying idea of 'peaceful' and 'lawful' action, we cannot be misled. * *

"Again, the right of an employer to have access to and from his place of business, and his right to have the streets and public highways in front of his place of business kept clear of crowds, bystanders, and curiosity seekers, is as strong as the right to picket, and no picketing which is conducted in a manner to attract and retain the presence of crowds can be said to be peaceful or within the law.

"It is a safe and proper generalization that any action having in it the element of intimidation or coercion, or abuse, physical or verbal, or of invasion of rights of privacy, when not performed under sanctions of law by those lawfully empowered to enforce the law, is unlawful; every act of speech, of gesture, or of conduct, which 'any fair-minded man' may reasonably judge to be intended to convey insult, threat, or annoyance to another, or to work assault or abuse upon him, is unlawful. Not a syllable of the Clayton Act, or of any other law, whether of legislation of Congress or of the common law, sanctions any of the incidents we have referred to. They are to be condemned as legally inexcusable—such must be the verdict of 'any fair-minded man'—nothing can be said in justification."

The Supreme Court of the United States, in *Truax* v. *Corrigan,* 257 U. S. —— (66 L. Ed. 132, 42 Sup. Ct. Rep. 124), decided December 19, 1921, in an opinion by Mr. Chief Justice TAFT, held the Arizona statute to be unconstitutional as construed by the Supreme Court of Arizona in that case. The opinion lays down the well-established principle, applicable here, that the plaintiff's business is a property right; it sets forth the settled law that free access for employees, owners and customers to the place of business is incident to such right. The Chief Justice wrote that,—

"Intentional injury caused to either right, or both, by a conspiracy, is a tort. Concert of action is a conspiracy if its object is unlawful or if the means used are unlawful."

Actual loss in that case was proved by the evidence. A question in the cause related to the legality or illegality of the means used. Alleged libelous attacks, abusive epithets, insistent and loud appeals by picketers, threats of injury to future customers, "all linked together in a campaign, were an unlawful annoyance and a hurtful nuisance in respect of the free access to the plaintiff's place of business." The complaint alleged:

"The defendants conspired to injure and destroy plaintiff's business by inducing his theretofore willing patrons and his would-be patrons not to patronize him, and they influenced them to withdraw or withhold their patronage:

"(1) By having the agents of the union walk forward and back constantly during all the business hours in front of plaintiff's restaurant and within five feet thereof, displaying a banner announcing in large letters that the restaurant was unfair to cooks and waiters and their union.

"(2) By having agents attend at or near the entrance of the restaurant during all the business hours and continuously announce in a loud voice, audible for a great distance, that the restaurant was unfair to the labor union.

"(3) By characterizing the employees of the plaintiffs as scab Mexican labor, and using opprobrious epithets concerning him in handbills continuously distributed in front of the restaurant to would-be customers.

"(4) By applying in such handbills abusive epithets to Truax, the senior member of plaintiff's firm, and making libelous charges against him, to the effect that he was tyrannical with his help, and chased them down the street with a butcher knife; that he broke his contract and repudiated his pledged word;

that he had made attempts to force cooks and waiters to return to work by attacks on men and women; that a friend of Truax assaulted a woman and pleaded guilty; that plaintiff was known by his friends, and that Truax's treatment of his employees was explained by his friend's assault; that he was a 'bad actor.'

"(5) By seeking to disparage plaintiff's restaurant, charging that the prices were higher and the food worse than in any other restaurant, and that assaults and slugging were a regular part of the bill of fare, with police indifferent.

"(6) By attacking the character of those who did patronize, saying that their mental caliber and moral fibre fell far below the American average, and enquiring of the would-be patrons—'Can you patronize such a place and look the world in the face?'·

"(7) By threats of similar injury to the would-be patrons—by such expressions as 'All ye who enter here leave all hope behind'; 'Don't be a traitor to humanity'; by offering a reward for any of the ex-members of the union caught eating in the restaurant; by saying in the handbills: 'We are also aware that handbills and banners in front of a business house on the main street give the town a bad name, but they are permanent institutions until William Truax agrees to the eight-hour day.'

"(8) By warning any person wishing to purchase the business from the Truax firm that a donation would be necessary, amount to be fixed by the District Trades Assembly, before the picketing and boycotting would be given up."

The court said:

"The result of this campaign was to reduce the business of the plaintiffs from more than $55,000 a year to one of $12,000.

"Plaintiffs' business is a property right (*Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 465 (65 L. Ed. 349, 356, 41 Sup. St. Rep. 172) * * and free access for employees, owner and customers, to his place of business, is incident to such right.

Intentional injury caused to either right, or both, by a conspiracy is a tort. Concert of action is a conspiracy if its object is unlawful or if the means used are unlawful. (*Pettibone* v. *United States,* 148 U. S. 197, 203 (37 L. Ed. 419, 13 Sup. Ct. Rep. 542, see, also, Rose's U. S. Notes); * * *Duplex Printing Press Co.* v. *Deering, supra.*) Intention to inflict the loss and the actual loss caused are clear. The real question is: Were the means used illegal? The above recital of what the defendants did can leave no doubt of that. The libelous attacks upon the plaintiffs, their business, their employees, and their customers, and the abusive epithets applied to them, were palpable wrongs. They were uttered in aid of the plan to induce plaintiffs' customers and would-be customers to refrain from patronizing the plaintiffs. The patrolling of defendants immediately in front of the restaurant on the main street and within five feet of plaintiffs' premises continuously during business hours, with the banners announcing plaintiffs' unfairness; the attendance by the picketers at the entrance to the restaurant, and their insistent and loud appeals all day long, the constant circulation by them of the libels and epithets applied to employees, plaintiffs, and customers, and the threats of injurious consequences to future customers, all linked together in a campaign, were an unlawful annoyance and a hurtful nuisance in respect of the free access to the plaintiffs' place of business. It was not lawful persuasion or inducing. It was not a mere appeal to the sympathetic aid of would-be customers by a simple statement of the fact of the strike and a request to withhold patronage. It was compelling every customer or would-be customer to run the gauntlet of most uncomfortable publicity, aggressive and annoying importunity, libelous attacks, and fear of injurious consequences, illegally inflicted, to his reputation and standing in the community. * * Violence could not have been more effective. It was moral coercion by illegal annoyance and obstruction, and it thus was plainly a conspiracy. (Citing numerous authorities.)

"A law which operates to make lawful such a wrong as is described in plaintiffs' complaint deprives the owner of the business and the premises of his property without due process, and cannot be held valid under the Fourteenth Amendment. * *

"It is argued that while the right to conduct a lawful business is property, the conditions surrounding that business, such as regulations of the state for maintaining peace, good order, and protection against disorder, are matters in which no person has a vested right. The conclusion to which this inevitably leads in this case is that the state may withdraw all protection to a property right by civil or criminal action for its wrongful injury, if the injury is not caused by violence. * *

"The due process clause requires that every man shall have the protection of his day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial, so that every citizen shall hold his life, liberty, property and immunities under the protection of the general rules which govern society. * *

"Here is a direct invasion of the ordinary business and property rights of a person, unlawful when committed by anyone, and remediable because of its otherwise irreparable character by equitable process, except when committed by ex-employees of the injured person. If this is not a denial of the equal protection of the laws, then it is hard to conceive what would be. To hold it not to be, would be, to use the expression of Mr. Justice BREWER in *Gulf C. & S. F. R. Co.* v. *Ellis*, 165 U. S. 150, 154 (41 L. Ed. 666, 667, 17 Sup. Ct. Rep. 255, see, also, Rose's U. S. Notes), to make the guaranty of equality clause 'a rope of sand.' * *

"Our conclusion, that plaintiffs are denied the equal protection of the laws, is sustained by the decisions of this court. (Citing many authorities.)

"It is urged that in holding paragraph 1464 invalid, we are in effect holding invalid section 20

of the Clayton Act. * * Of course, we are not doing so. * *

"We held that these clauses were merely declaratory of what had always been the law and the best practice in equity, and we thus applied them. The construction put upon the same words by the Arizona Supreme Court makes these clauses of paragraph 1464 as far from those of section 20 of the Clayton Act in meaning as if they were in wholly different language."

On December 5, 1921, the Supreme Court of the United States decided the case of *American Steel Foundries* v. *Tri-City Central Trades Council*, 257 U. S. —— (66 L. Ed. 103, 42 Sup. Ct. Rep. 72). The opinion of the court, delivered by Mr. Chief Justice TAFT, contains a construction of Section 20 of the Clayton Act, together with a full discussion on the subject of picketing. The plaintiff was a New Jersey corporation, engaged in the manufacture of steel products in the State of Illinois. When in full operation, in November, 1913, it had in its employ 1,600 men. It resumed operations in April following, with about 350 regular men. A trade dispute arose, as to the amount of wages. The Trades Council appointed a committee to secure a reinstatement of the previous wages. The committee was informed that the plant was run as an open shop and they refused to deal with the committee, but were ready to entertain complaints made by employees. On April 22d, a strike was declared. A picket was established about the plant. Picketing was carried on for about four weeks without cessation, by three or four groups of picketers, each group consisting of four to twelve persons. The plaintiff company applied for relief, and an injunction was issued by the District Court for the Southern District of Illinois

in May, 1914, restraining the Trades Council and certain individual defendants from "the use of persuasion, threats, or personal injury, intimidation, suggestion of danger, or threats of violence of any kind," thus preventing them from hindering or obstructing employees of the plaintiff in connection with its business. Picketing at or near the premises of the plaintiff was likewise forbidden. The defendants appealed to the Circuit Court of Appeals, where the injunction was modified by striking out the word "persuasion" and inserting after the words "restraining picketing," the words "in a threatening or intimidating manner": See *Tri-City Central Trades Council* v. *American Steel Foundries*, 238 Fed. 728 (151 C. C. A. 578). Mr. Chief Justice TAFT, in rendering the opinion of the court, after quoting Section 20 of the Clayton Act, among other things said:

"It has been determined by this court that the irreparable injury to property or to a property right, in the first paragraph of Section 20, includes injury to the business of an employer, and that the second paragraph applies only in cases growing out of a dispute concerning terms or conditions of employment, between an employer and employee, between employers and employees, or between employees, or between persons employed and persons seeking employment, and not to such dispute between an employer and persons who are neither ex-employees nor seeking employment. * *

"The prohibitions of Section 20, material here, are those which forbid an injunction against, first, recommending, advising, or persuading others by peaceful means to cease employment and labor; second, attending any place where such person or persons may lawfully be for the purpose of peacefully obtaining or communicating information, or

peacefully persuading any person to work or abstain from working; third, peacefully assembling in a lawful manner and for lawful purposes. This court has already called attention in the Duplex case to the emphasis upon the words 'peaceable' and 'lawful' in this section: *Duplex Printing Press Co.* v. *Deering*, 254 U. S. 443, 473 (65 L. Ed. 349, 41 Sup. Ct. Rep. 172). It is clear that Congress wished to forbid the use by the federal courts of their equity arm to prevent peaceable persuasion by employees, discharged or expectant, in promotion of their side of the dispute, and to secure them against judicial restraint in obtaining or communicating information in any place where they might lawfully be. This introduces no new principle into the equity jurisprudence of those courts. It is merely declaratory of what was the best practice always. Congress thought it wise to stabilize this rule of action and render it uniform.

"The object and problem of Congress in Section 20, and, indeed, of courts of equity before its enactment, was to reconcile the rights of the employer in his business and in the access of his employees to his place of business and egress therefrom without intimidation or obstruction, on the one hand, and the right of the employees, recent or expectant, to use peaceable and lawful means to induce present employees and would-be employees to join their ranks, on the other. If, in their attempts at persuasion or communication with those whom they would enlist with them, those of the labor side adopt methods which, however lawful in their announced purpose, inevitably lead to intimidation and obstruction, then it is the court's duty, which the terms of Section 20 do not modify, so to limit what the propagandists do as to time, manner, and place as shall prevent infractions of the law and violations of the right of the employees, and the employer for whom they wish to work. * *

"How far may men go in persuasion and communication, and still not violate the right of those whom

they would influence? In going to and from work, men have a right to as free a passage without obstruction as the streets afford, consistent with the right of others to enjoy the same privilege. We are a social people, and the accosting by one of another in an inoffensive way, and an offer by one to communicate and discuss information with a view to influencing the other's action, are not regarded as aggression or a violation of that other's rights. If, however, the offer is declined, as it may rightfully be, then persistence, importunity, following and dogging, become unjustifiable annoyance and obstruction which is likely soon to savor of intimidation. From all of this, the person sought to be influenced has a right to be free, and his employer has a right to have him free.

"The nearer this importunate intercepting of employees or would-be employees is to the place of business, the greater the obstruction and interference with the business, and especially with the property right of access of the employer. Attempted discussion and argument of this kind in such proximity is certain to attract attention and congregation of the curious, or, it may be, interested bystanders, and thus to increase the obstruction as well as the aspect of intimidation which the situation quickly assumes. * * All information tendered, all arguments advanced, and all persuasion used under such circumstances were intimidation. They could not be otherwise. It is idle to talk of peaceful communication in such a place and under such conditions. * * "

9. We have quoted largely from the foregoing decisions because they are illuminating and authoritative. The case of *Truax* v. *Corrigan, supra,* is the most important case involving trade disputes that has been determined in years. Under that opinion construing the Fourteenth Amendment, no state can pass a law legalizing such picketing as took place

in the Truax case. The opinion by Mr. Chief Justice TAFT in the case of *American Steel Foundries* v. *Tri-City Central Trades Council, supra,* contains a more thorough discussion of the subject of picketing than was made by that court prior to its rendition. The other cases quoted from are valuable precedents in determining the validity of our statute.

In view of the teaching of the authorities, we could not hold Chapter 346, Laws of 1919, valid, if construed to be a justification of the manner and method of picketing in the case at issue. The patrolling was not done for the purpose of obtaining information, nor yet in order peacefully to persuade the employees to quit work. It is a case of boycotting.

Had no strike existed, would it have been lawful for the pickets employed in this case to take their stand at the entrances to plaintiff's places of business, or to patrol the sidewalks in front thereof, so as to cause the entrances to such stores to be obstructed to some extent, and during all the business hours of the day, week after week, to call out in loud tones, denouncing plaintiff to his customers and others, advising them not to purchase anything from him but to go elsewhere if they would buy, thus causing annoyance and substantial loss in business? We think not. If such conduct is not lawful in the absence of a strike, it is not legalized by a strike. A man has a right to pursue his vocation in a peaceful manner.

10. From the authorities, we deduce the doctrine that it is as much the duty of a court of equity to protect a man's right to follow his lawful business without illegal interference, as to grant injunctive relief to prevent the destruction of his physical property. The first duty of the state is so to admin-

ister its laws as to enforce order. Intimidation and good order cannot coexist in front of the entrances to plaintiff's stores.

This case is affirmed.

FORMER OPINION MODIFIED AND DECREE APPEALED FROM AFFIRMED.

McCourt, J., took no part in the consideration of this case.