Complainants, thirty-six in number, are members of the Needle Trades Workers Industrial Union, lately employed by *Page 463 
defendant in its factory at Fair Lawn. With half a dozen other men, complainants comprised all defendant's employes engaged in the actual work of dressing rabbit skins.
In August last, defendant's employes, including complainants, went on strike. Defendant immediately got in touch with a rival union, the International Fur Workers Union, and soon agreed to hire only its members and not to recognize or deal with the union to which complainants belong. Defendant refused and still refuses to negotiate with complainants or to re-employ them unless they join the fur workers union. The same day the strike began, defendant executed the so-called re-employment agreement with the president of the United States. This agreement, by reference, embodies section 7(a) of the National Industrial Recovery act (N.I.R.A.) of June 16th, 1933, which reads as follows:
"Every code of fair competition, agreement, and license approved, prescribed, or issued under this title shall contain the following conditions: (1) That employes shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; (2) that no employe and no one seeking employment shall be required as a condition of employment to join any company union or to refrain from joining, organizing, or assisting a labor organization of his own choosing; and (3) that employers shall comply with the maximum hours of labor, minimum rates of pay, and other conditions of employment, approved or prescribed by the president."
Complainants pray that defendant may be restrained from making it a condition of their employment or re-employment that complainants become members of the fur workers union or of any other body, except one of their own choice, and from interfering in any way with complainants in their right to organize and bargain collectively through representatives of their own choice. *Page 464 
The first question is whether the court of chancery has jurisdiction of the cause of action arising, as it does, out of a statute of the United States. A court of one state, in general, has jurisdiction of transitory causes of action given by the statutes of a foreign state. Tennessee Coal, Iron and RailroadCo. v. George, 233 U.S. 354; 34 S.C. 587; Evey v. MexicanCentral Railway Co., 81 Fed. Rep. 294; 26 C.C.A. 407. Rights, whether legal or equitable, acquired under the laws of the United States, may be prosecuted in a state court competent to decide rights of the like character and class, subject, however, to this qualification, that congress may, if it see fit, give to the federal courts exclusive jurisdiction. Where such exclusive jurisdiction is not given or necessarily implied, resort may be had to the state court. Claflin v. Houseman, 93 U.S. 130;23 L.Ed. 833; United States v. Smith, 4 N.J. Law 38. Neither the Recovery act nor any other statute to which I am referred vests exclusive jurisdiction, in cases like the present one, in the federal courts.
Another rule is urged by defendant: "Where the provision for the liability is coupled with a provision for a special remedy, that remedy and that alone must be employed." Pollard v.Bailey, 87 U.S. 520; 22 L.Ed. 376. Section 3 (c) of the Recovery act directs the several district attorneys of the United States to institute proceedings in equity to prevent violations of any code of fair competition approved under the act. The present suit is not brought on a code of fair competition and no violation of such a code is charged. Hence, the special remedy given by the statute is not available to redress the alleged wrong. Complainants are properly in the court of chancery of New Jersey.
The next question is whether the cause of action belongs to complainants. Relief, if it be obtained, must go on the theory of contract, and complainants are not parties to the contract. "It is generally held, subject to qualifications, that a third person may sue upon a promise made to another for his benefit. Sometimes the right is placed by the courts upon provisions in codes giving the `real party in interest' the right to prosecute suits. Sometimes it is based upon the theory of *Page 465 
a trust; the promisor being regarded as trustee for the third party. Sometimes it is based upon the theory of agency, the promisee in the contract being considered the agent of the third party who adopts his acts in suing upon the contract. But whatever may be the correct theory, one thing is essential to the right and that is that the third person be the real promisee, that the promise be made to him in fact, although not in form. It is not enough that the contract may operate to his benefit; but must appear that the parties intend to recognize him as the primary party in interest and as privy to the promise."Pennsylvania Steel Co. v. New York City Railway Co.,198 Fed. Rep. 721; 117 C.C.A. 503, 531.
"The difficulties which presented themselves in the case of suits by third persons upon contracts made by others, were two — the want of privity, and the want of consideration moving from the third person. These difficulties have been overcome in this state, as to contracts not under seal, by decisions of the courts and, as to contracts under seal, by the statute. The only effect of the decisions and the statute is that privity of contract is not requisite in order to maintain the action, and the consideration need not move from the person for whom the contract is made. Neither the cases above cited, nor the statute, go so far as to permit a suit upon contract to be maintained by persons with whom the defendant never meant to enter into contractual relations. It is not enough that the plaintiff may be benefited by the performance of the contract. He can only maintain the action when the contract is made for him. It would be a decided novelty to hold that any one contracting with a municipal corporation is liable to an action of contract, not only by the corporation, but by every citizen of the municipality." Styles
v. F.R. Long Co., 70 N.J. Law 301.
Are complainants within the rule? The first half of the re-employment contract deals with hours of work and wages. The only parties directly affected by these stipulations are the employer himself and the employes. It seems clear to me that employes are a primary party in interest to the contract; the promise, in substance, was to them. Complainants can sue thereon. *Page 466 
A contract is not enforceable unless supported by a valuable consideration. The re-employment agreement does not state any consideration. Its opening words are these: "During the period of the president's emergency re-employment drive, that is to say, from August 1st to December 31st, 1933, or to any earlier date of approval of a code of fair competition to which he is subject, the undersigned hereby agrees with the president as follows": The agreement was made pursuant to section 4(a) of the federal statute: "The president is authorized to enter into agreements with, and to approve voluntary agreements between and among, persons engaged in a trade or industry, labor organizations, and trade or industrial organizations, associations, or groups, relating to any trade or industry, if in his judgment such agreements will aid in effectuating the policy of this title with respect to transactions in or affecting interestate or foreign commerce, and will be consistent with the requirements of clause (2) of sub-section (a) of section 3 for a code of fair competition." Defendant expressly waives, for the purpose of the present motion, doubts of the constitutionality of the statute.
The policy of the title referred to is stated in the first section thereof, and among other things, "to eliminate unfair competitive practices, to increase the consumption of industrial and agricultural products by increasing purchasing power, to reduce and relieve unemployment, to improve standards of labor, and otherwise to rehabilitate industry." On July 24th, 1933, the president delivered a radio address dealing in part with the re-employment agreement. "We have sent out to all employers an agreement which is the result of weeks of consultation. * * * It is a plan, deliberate, reasonable and just, intended to put into effect at once the most important of the broad principles which are being established, industry by industry, through codes. Naturally, it takes a good deal of organizing and a great many hearings and many months to get these codes perfected and signed and we cannot wait for all of them to go through. The blanket agreement, however, which I am sending to every employer, will start the wheels turning now and not six *Page 467 
months from now. * * * Those who co-operate in this program must know each other at a glance, that is why we have provided a badge of honor for this purpose; a simple design with a legend `we do our part,' and I ask that all those who join with me shall display that badge prominently. * * * And it is my purpose to keep posted in the post office of every town a roll of honor of all those who join with me. * * * While the shirking employer may undersell his competitor, the saving he thus makes is made at the expense of his country's welfare. * * * The essence of the principle is a universal limitation of hours of work per week for any individual by common consent and a universal payment of wages above a minimum, also by common consent. I cannot guarantee the success of this nation-wide plan, but the people of this country can guarantee its success."
And with the draft agreement the president sent out a statement addressed to every employer: "This agreement is part of a nation-wide plan to raise wages, create employment and thus increase purchasing power and restore business; that plan depends wholly on united action by all employers. For this reason I ask you, as an employer, to do your part by signing."
The agreement itself, in paragraph 10, contains this pledge: "To support and patronize establishments which also have signed this agreement and are listed as members of N.R.A. (national recovery administration)."
As a result of the president's appeal, thousands of employers throughout the country signed the re-employment agreement identical with that signed by defendant. What bargain did defendant make? What did it obtain as compensation for its promises? First, the blue eagle, the badge of honor of which the president had spoken, and with it the benefit of the pledge of all other members of N.R.A. to patronize their fellow members. Again, each employer who signed did so in reliance on the fact that his competitors would likewise sign and would assume the same burdens, so that the increase in his labor costs would not put him at a disadvantage, since all his competitors would be subject to a like increase. I think *Page 468 
these considerations, slight as they are, are sufficient to support a promise of this character, intended to promote a great public endeavor. The same principle should be applied which is often found in cases dealing with subscriptions to charities:
"The objection of the want of consideration for promises like the one before us has not always been regarded with favor; and judges considering defenses of that character as breaches of faith toward the public and especially toward those engaged in the same enterprise and an unwarrantable disappointment of reasonable expectations of those interested, have been willing, nay, apparently anxious, to discover a consideration which would uphold the undertaking as a valid contract." Barnes v.Perrine, 12 N.Y. 18, 23. See 60 C.J. 956. How slight a consideration is necessary in such cases is illustrated by NewJersey Orthopedic Hospital, c., v. Wright, 95 N.J. Law 462.
"One inference that the jury might legitimately draw from this evidence is that Mrs. Barr based her subscription on the agreement, first, that the money, while part of the general fund, was to be specifically applied to a stated purpose, viz., the building of an operating room; secondly, that the operating room was to bear a name suggested by her; thirdly, that she would contribute if the committee would obtain the waiver by Mr. Graves of his prior claim on the room and that they actually did obtain that waiver. Any one of these things would be a legal consideration for the promise." Defendant's agreement is supported by a sufficient consideration.
I turn to the meritorious question, whether defendant has violated his undertaking. The statutory provision embodied in defendant's contract and relied on by complainants is quoted above. Let us first consider the second clause: "That no employe and no one seeking employment shall be required as a condition of employment, to join any company union or to refrain from joining, organizing, or assisting, a labor organization of his own choosing." A company union, as I understand it, is one all of whose members are employes of a single company or group of affiliated companies. Complainants concede that the fur workers union is not a company *Page 469 
union. It will be noted that an employer is not expressly forbidden from requiring an employe to join a union named by the employer, except it be a company union. Therefore, says defendant, it is within its rights when it requires all its employes to join the fur workers union. However, the rules of most labor unions and of the fur workers union and the needle trades union are such that a workman cannot be a member of two competing unions. If they join the fur workers union, complainants must resign from the union of their own choice. And so complainants say that the action of defendant does constitute a violation. If this provision of the section stood alone, I would accept defendant's contention as correct and would say congress intended that while employes should not be required by their employer to join a company union, still they might properly be required to become members of any other bona fide union designated by their employer; in other words, the employer could operate a closed shop.
The first provision of the section is this: "That employes shall have the right to organize and bargain collectively through representatives of their own choosing, and shall be free from the interference, restraint or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." This enactment, embodied in the contract, gave complainants, while they were employes of defendant and constituted a majority of such employes engaged in rabbit dressing, the right to organize themselves as members of the needle trades union and the right, if they so chose, to bargain collectively with defendant through the agents of that union. Defendant could not, without breach of its agreement, coerce them into a different organization or compel them to accept as their representative an agent of the fur workers union. It is true that complainants went on strike, but even while on strike, they remained, for the present purpose, employes of defendant. I think the whole matter works out in this fashion: If a majority of the employes are members of *Page 470 
a particular union or desire to organize within a particular union, the employer cannot dictate to them another union. But if they are not organized and are, in fact, indifferent as to how they shall be organized, or if the enterprise is just starting, then the employer may choose his union and require all his men to join it.
Defendant admits that it has made the reinstatement of complainants conditional on their joining the fur workers union. With that union only will it bargain. This, as I view the case, is a violation of the contract, and complainants may have a remedy for the wrong in this court. The irreparable injury which complainants may sustain pending final hearing is apparent. There should be interlocutory restraint in the matters above discussed.