[No. 26371. *En Banc.* March 11, 1937.]

R. J. McDONALD, *Appellant*, v. PEND OREILLE MINES & METALS COMPANY, *Respondent.*[1]

[1]Reported in 65 P. (2d) 1250.

*Evert Arnold* and *C. W. Greenough,* for appellant.

*Davenport & Wakefield,* for respondent.

MILLARD, J.—Plaintiff, on behalf of himself and sixty other employees of defendant domestic corporation, seeks recovery against the defendant as beneficiaries of a contract made by the defendant with the President of the United States. The sixty-one causes of action are based upon the President's Reemployment Agreement, oral promises, and estoppel.

The complaint alleges that, on or about August 14, 1933, defendant voluntarily entered into an agreement known as the President's Reemployment Agreement with the President of the United States with reference to employment of labor covering the period from August 1, 1933, to December 31, 1933. The agreement reads as follows:

"EXHIBIT A

"PRESIDENT'S REEMPLOYMENT AGREEMENT

"During the period of the President's emergency reemployment drive, that is to say, from August 1, to December 31, 1933, or to any earlier date of approval of a Code of Fair Competition to which he is subject,

the undersigned hereby agreed with the President as follows:

"(1)  After August 31, 1933, not to employ any person under 16 years of age, except that persons between 14 and 16 may be employed (but not in manufacturing or mechanical industries) for not to exceed 3 hours per day and those hours between 7 a. m. and 7 p. m. in such work as will not interfere with hours of day school.

"(2)  Not to work any accounting, clerical, banking, office, service, or sales employees (except outside salesmen) in any store, office department, establishment, or public utility, or on any automotive or horse-drawn passenger, express, delivery, or freight service, or in any other place or manner, for more than 40 hours in any one week and not to reduce the hours of any store or service operation to below 52 hours in any 1 week, unless such hours were less than 52 hours per week before July 1, 1933, and in the latter case not to reduce such hours at all.

"(3)  Not to employ any factory or mechanical worker or artisan more than a maximum week of 35 hours until December 31, 1933, but with the right to work a maximum week of 40 hours for any 6 weeks within this period; and not to employ any worker more than 8 hours in any 1 day.

"(4)  The maximum hours fixed in the foregoing paragraphs (2) and (3) shall not apply to employees in establishments employing not more than two persons in towns of less than 2,500 population which towns are not part of a larger trade area; nor to registered pharmacists or other professional persons employed in their profession; nor to employees in a managerial or executive capacity, who now receive more than $35 per week; nor to employees on emergency maintenance and repair work; nor to very special cases where restrictions of hours of highly skilled workers on continuous processes would unavoidably reduce production but, in any such special case, at least time and one third shall be paid for hours worked in excess of the maximum. Population for the purposes of this agree-

ment shall be determined by reference to the 1930 Federal census.

"(5) Not to pay any of the classes of employees mentioned in paragraph (2) less than $15 per week in any city of over 500,000 population, or in the immediate trade area of such city; nor less than $14.50 per week in any city of between 250,000 and 500,000 population or in the immediate trade area of such city; nor less than $14 per week in any city of between 2,500 and 250,000 population, or in the immediate trade area of such city; and in towns of less than 2,500 population to increase all wages by not less than 20 per cent, provided that this shall not require wages in excess of $12 per week.

"(6) Not to pay any employee of the classes mentioned in paragraph (3) less than 40 cents per hour, unless the hourly rate for the same class of work on July 15, 1929, was less than 40 cents per hour, in which latter case not to pay less than the hourly rate on July 15, 1929, and in no event less than 30 cents per hour. It is agreed that this paragraph establishes a guaranteed minimum rate of pay regardless of whether the employee is compensated on the basis of a time rate or on a piecework performance.

"(7) Not to reduce the compensation for employment now in excess of the minimum wages hereby agreed to (notwithstanding that the hours worked in such employment may be hereby reduced) and to increase the pay for such employment by an equitable readjustment of all pay schedules.

"(8) Not to use any subterfuge to frustrate the spirit and intent of this agreement which is, among other things, to increase employment by a universal covenant, to remove obstructions to commerce, and to shorten hours and to raise wages for the shorter week to a living basis.

"(9) Not to increase the price of any merchandise sold after the date hereof over the price on July 1, 1933, by more than is made necessary by actual increases in production, replacement, or invoice costs of merchandise, or by taxes or other costs resulting from action taken pursuant to the Agricultural Adjustment

Act, since July 1, 1933, and, in setting such price increases, to give full weight to probable increases in sales volume and to refrain from taking profiteering advantage of the consuming public.

"(10) To support and patronize establishments which also have signed this agreement and are listed as members of N. R. A. (National Recovery Administration).

"(11) To cooperate to the fullest extent in having Code of Fair Competition submitted by his industry at the earliest possible date, and in any event before September 1, 1933.

"(12) Where, before June 16, 1933, the undersigned had contracted to purchase goods at a fixed price for delivery during the period of this agreement, the undersigned will make an appropriate adjustment of said fixed price to meet any increase in cost caused by the seller having signed this President's Reemployment Agreement or having become bound by any Code of Fair Competition approved by the President.

"(13) This agreement shall cease upon approval by the President of a code to which the undersigned is subject; or, if the N. R. A. so elects, upon submission of a code to which the undersigned is subject and substitution of any of its provisions for any of the terms of this agreement.

"(14) It is agreed that any person who wishes to do his part in the President's reemployment drive by signing this agreement, but who asserts that some particular provision hereof, because of peculiar circumstances, will create great and unavoidable hardship, may obtain the benefits hereof by signing this agreement and putting it into effect and then, in a petition approved by a representative trade association of his industry, or other representative organization designated by N. R. A., may apply for a stay of such provision pending a summary investigation by N. R. A., if he agrees in such application to abide by the decision of such investigation. This agreement is entered into pursuant to section 4 (a) of the National Industrial Recovery Act and subject to all the terms and conditions required by sections 7 (a) and 10 (b) of that act.

" 'This Agreement is subject to the substitution of

Sections II, III and IV of the Code of Fair Competition submitted for the Zinc Industry for Sections 3, 6 and 9 of the President's Reemployment Agreement.'
"Dated August 14, 1933
"(Sign Here)      Lewis P. Larsen
Name
President
Official Position
Pend Oreille Mines & Metals Co.
Firm & corporation name
ZINC
Industry or trade
Seventy-three (73)
Number of employees at the date of signing
"Metaline Falls                    Washington
Town or city                      State"

On December 19, 1933, the President of the United States, by executive order, offered to defendant and other employers of labor an extension of the above-quoted agreement to April 30, 1934. That offer reads as follows:

"EXHIBIT B
"No. 6513
"EXECUTIVE ORDER
"EXTENSION OF THE PRESIDENT'S REEMPLOYMENT
AGREEMENT TO APRIL 30, 1934.

"I, Franklin D. Roosevelt, President of the United States, pursuant to the authority vested in me by title I of the National Recovery Act, approved June 16, 1933, and otherwise do hereby provide as follows and do hereby prescribe the rules and regulations hereinafter set forth which I deem necessary for carrying out the purpose of title I of said act:

"I hereby offer to enter into the President's Reemployment Agreement with every employer, insofar as he is not covered by an approved code of fair competition, for a further period of 4 months from January 1, 1934, to April 30, 1934, or to any earlier date of approval of a code of fair competition to which he is subject.

"Employers who shall have already signed the President's Reemployment Agreement before January 1, 1934, may accept this offer of extension by display of the Blue Eagle on or after January 1, 1934. Employers who shall not have signed the President's Reemployment Agreement before January 1, 1934, may accept this offer of extension by signing the President's Reemployment Agreement.

"All substitutions and exemptions approved, and all exceptions granted to particular employers, before January 1, 1934, will apply to the President's Reemployment Agreement as so extended.

"Display of the Blue Eagle on or after January 1, 1934, by an employer who shall have signed the President's Reemployment Agreement prior to January 1, 1934, shall be deemed an acceptance of this offer of extension; and for the purpose of my Executive order dated October 14, 1933, which among other things prohibits false representation of compliance with the provisions of the President's Reemployment Agreement, display of the Blue Eagle by any employer on or after January 1, 1934, shall be deemed a representation that he is complying with the President's Reemployment Agreement, as extended by this Executive order.

"I hereby authorize the Administrator for Industrial Recovery to make such rules and regulations as he may deem necessary to supplement, amplify or carry out the purposes and intent of this Executive order.
"The White House          Franklin D. Roosevelt
"December 19, 1933."

The complaint further alleges: Defendant voluntarily accepted the offer of extension. The agreement and its extension were made for the benefit of the employees of defendants. The agreement and extension were in full force and effect from August 1, 1933, to April 30, 1934.

On or about August 1, 1933, defendant, in violation of the above-quoted agreement and its extension, reduced the wages of plaintiff and his assignors, and failed to increase the pay for the employment of plain-

tiff and his several assignors by an equitable readjustment of all pay schedules as provided in the agreement above quoted. Plaintiff and his sixty assignors were employed from August 1, 1933, to April 21, 1934. At the latter date, the defendant locked out plaintiff and his assignors and refused to permit them to continue their employment. By reason of such reduction in wages and breach of agreement and its extension, defendant became indebted to plaintiff and his several assignors in the amounts for which they pray in each of the several causes of action.

The defendant is estopped to deny its indebtedness to the plaintiff and his assignors in the amounts claimed, inasmuch as defendant did, from August 14, 1933, to April 21, 1934, display the Blue Eagle insignia, and on or about August 14, 1933, executed a certificate of compliance reading as follows:

"CERTIFICATE OF COMPLIANCE

"I/We certify that we have adjusted the hours of labor and the wages of our employees to accord with the President's Reemployment Agreement which we have signed. 'To the extent of N. R. A. consent as announced we have complied with the President's Agreement by complying with the substituted provisions of the code submitted for the zinc industry.'

"Lewis P. Larsen
"Pend Oreille Mines & Metals Company
Firm Name
"Zinc Industry
Industry or trade
"Metaline Falls, Washington"
Town or city      State

As a second theory of recovery, plaintiff alleged:

"That defendant orally promised plaintiff and his assignors that it would pay to them the same wages per day and per week that they had received for several weeks prior to August 1, 1933, notwithstanding reduction in hours of employment agreed to in 'Ex-

hibit A'. That by all such actions and conduct defendant held itself out as paying to plaintiff the wages provided for in said Exhibit A, and that defendant thereby received the benefit of public good will and friendly feeling and cooperation from business and industry.''

Upon the ground that the complaint did not state facts sufficient to constitute a cause of action, defendant demurred, which demurrer was sustained. The trial court was of the view that the President's Reemployment Agreement was invalid because procured by coercion, and it is upon this ground that the demurrer was sustained.

Mindful of the rule that, if the agreement was in law a voluntary one, the defendant would be bound thereby, and that the defense of coercion is ordinarily a matter of proof, the trial court said:

''It is true, of course, that ordinarily where a defense of duress or coercion is interposed to the attempted enforcement of an agreement or contract, the party setting up such defense has the burden of establishing it by competent evidence. But in their opinion in the *Butler* case the supreme court imply coercion or duress by economic pressure as the inducing cause of the making of the agreement on the part of the employer.

''It is to be observed, moreover, that when the agreement was tendered to the defendant for its acceptance, it was confronted with the provision of the statute that if it failed to execute the instrument it would be subjected to the imposition of a code, for any violation of the provisions of which it would incur a penalty.

''If the agreement were in law a voluntary agreement, the defendant should in conscience and good faith be required to live up to it. Having enjoyed all its benefits and the plaintiff and his assignors having performed their services in contemplation of its provisions, the defendant would have been deemed to have waived any legal objections which might otherwise have been raised against its validity. 'A person may, by his acts or omission to act, waive a right which he

might otherwise have under the Constitution of the United States.' *Pierce vs. Somerset Ry.*, 43 L. Ed. (U. S. S. Ct.), 316.

"But as has been seen, the agreement was in law not voluntary but induced by coercive means; and having been so induced, the defendant could not in reason be deemed to have waived its right to raise any constitutional or other legal objections to its enforcement."

The plaintiff elected to stand upon his complaint, whereupon judgment of dismissal was entered. Plaintiff appealed.

■ The National Industrial Recovery Act and the President's Agreement, quoted above, disclose the existence of a coercive influence which the trial court deemed rendered the agreement invalid. Section 1 of that act (June 16, 1933, chapter 90, Title I; 48 Stat. 195; U. S. C. A., Title 15, Commerce and Trade, 1936 Pocket Part, §§ 701-712) declared a national emergency.

Section 2 of the act authorizes the President to establish agencies to effectuate the policy of the act.

Section 3 provided for the adoption of "codes of fair competition," and in the event that so-called voluntary codes were not adopted, for the imposition of mandatory codes (subd. (d), § 3, *supra*).

Section 4 of the act provided for so-called voluntary agreements; and in default thereof for the licensing of businesses pursuant to such regulations as the President might prescribe, and for the fine and imprisonment of persons carrying on business without a license. That section reads as follows:

"Sec. 704. (a) The President is authorized to enter into agreements with, and to approve voluntary agreements between and among, persons engaged in a trade or industry, labor organizations, and trade or industrial organizations, associations, or groups, relating to any trade or industry, if in his judgment such agreements will aid in effectuating the policy of this chapter

with respect to transactions in or affecting interstate or foreign commerce, and will be consistent with the requirements of clause (2) of subsection (a) of section 703 of this title for a code of fair competition.

"(b) Whenever the President shall find that destructive wage or price cutting or other activities contrary to the policy of this chapter are being practiced in any trade or industry or any subdivision thereof, and, after such public notice and hearing as he shall specify, shall find it essential to license business enterprises in order to make effective a code of fair competition or an agreement under this chapter or otherwise to effectuate the policy of this chapter, and shall publicly so announce, no person shall, after a date fixed in such announcement, engage in or carry on any business, in or affecting interstate or foreign commerce, specified in such announcement, unless he shall have first obtained a license issued pursuant to such regulations as the President shall prescribe. The President may suspend or revoke any such license, after due notice and opportunity for hearing, for violations of the terms or conditions thereof. Any order of the President suspending or revoking any such license shall be final if in accordance with law. Any person who, without such a license or in violation of any condition thereof, carries on any such business for which a license is so required, shall, upon conviction thereof, be fined not more than $500, or imprisoned not more than six months, or both, and each day such violation continues shall be deemed a separate offense. Notwithstanding the provisions of section 702 (c) of this title, this subsection shall cease to be in effect at the expiration of one year after June 16, 1933, or sooner if the President shall by proclamation or the Congress shall by joint resolution declare that the emergency recognized by section 701 has ended." (June 16, 1933, chapter 90, Title I, §4, 48 Stat. 197.)

Section 5 of the act exempted codes, agreements and licenses from operation of anti-trust laws.

Section 7 provides for the contents of code agreements and licenses as they relate to labor and labor

conditions and for a mandatory code to be prescribed by the President in the absence of mutual agreement.

■ That the agreement prescribed by the President contemplated a boycott against all who did not become members of the National Recovery Administration by signing the President's Agreement, clearly appears from a reading of the act.

"Sec. 710. (a) The President is authorized to prescribe such rules and regulations as may be necessary to carry out the purposes of this chapter, and fees for licenses and for filing codes of fair competition and agreements, and any violation of any such rule or regulation shall be punishable by fine of not to exceed $500, or imprisonment for not to exceed six months, or both.

"(b) The President may from time to time cancel or modify any order, approval, license, rule, or regulation issued under this chapter; and each agreement, code of fair competition, or license approved, prescribed, or issued under this chapter shall contain an express provision to that effect." (June 16, 1933, chapter 90, Title I, §10, 48 Stat. 200.)

Patently, the employer was confronted with a boycott and with the imposition of a compulsory code if he did not sign. Under such circumstances, there was not, in fact, any power of choice.

■ In principle, the case at bar is not distinguishable from *United States v. Butler*, 297 U. S. 1, 56 S. Ct. 312, 80 L. Ed. 287; which case involved agreements between farmers and the department of agriculture under the Agricultural Adjustment Act. With slight paraphrasing the following language from that opinion would be apt in the case at bar:

"The Government asserts that whatever might be said against the validity of the plan if compulsory, it is constitutionally sound because the end is accomplished by voluntary cooperation. There are two sufficient answers to the contention. The regulation is not in fact voluntary. The farmer, of course, may refuse to com-

ply, but the price of such refusal is the loss of benefits. The amount offered is intended to be sufficient to exert pressure on him to agree to the proposed regulation. The power to confer or withhold unlimited benefits is the power to coerce or destroy. If the cotton grower elects not to accept the benefits, he will receive less for his crops; those who receive payments will be able to undersell him. The result may well be financial ruin. The coercive purpose and intent of the statute is not obscured by the fact that it has not been perfectly successful. It is pointed out that, because there still remained a minority whom the rental and benefit payments were insufficient to induce to surrender their independence of action, the Congress has gone further and, in the Bankhead Cotton Act, used the taxing power in a more directly minatory fashion to compel submission. This progression only serves more fully to expose the coercive purpose of the so-called tax imposed by the present act. It is clear that the Department of Agriculture has properly described the plan as one to keep a non-cooperating minority in line. This is coercion by economic pressure. The asserted power of choice is illusory.''

The Bituminous Coal Conservation Act of 1935 imposed a tax of fifteen per cent on the sale price of coal, with the proviso that any producer who filed an acceptance of the code should be entitled to a return of ninety per cent of the tax. That act also provided that the United States should purchase no coal from non-complying producers, and that each contract made by the United States should require the contractor to buy only from code members. The act established the method of fixing hours and wages the same as the National Industrial Recovery Act sought to regulate hours and wages by agreement between the government and the employer, and used the threat of boycott to compel the employer to obey.

Approximately two months subsequent to the date of the entry of the judgment in the case at bar, the

United States supreme court passed on the validity of the Bituminous Coal Conservation Act of 1935 in *Carter v. Carter Coal Co.*, 298 U. S. 238, 56 S. Ct. 855, 80 L. Ed. 1160. The language used by the United States supreme court in that case as follows is applicable to the facts in the case at bar:

"It is very clear that the 'excise tax' is not imposed for revenue but exacted as a penalty to compel compliance with the regulatory provisions of the act. The whole purpose of the exaction is to coerce what is called an agreement—which, of course, it is not, for it lacks the essential element of consent. One who does a thing in order to avoid a monetary penalty does not agree; he yields to compulsion precisely the same as though he did so to avoid a term in jail. . . .

"That the act, whatever it may be in form, in fact is compulsory clearly appears. We have already discussed §3, which imposes the excise tax as a penalty to compel 'acceptance' of the code. Section 14 provides that the United States shall purchase no bituminous coal produced at any mine where the producer has not complied with the provisions of the code; and that each contract made by the United States shall contain a provision that the contractor will buy no bituminous coal to use on, or in the carrying out of, such contract unless the producer be a member of the code, as certified by the coal commission. In the light of these provisions, we come to a consideration of subdivision (g) of Part III. of §4, dealing with 'Labor Relations.'

"That subdivision delegates the power to fix maximum hours of labor to a part of the producers and the miners—namely, 'the producers of more than two-thirds of the annual national tonnage production for the preceding calendar year' and 'more than one-half of the mine workers employed;' and to producers of more than two-thirds of the district annual tonnage during the preceding calendar year and a majority of the miners, there is delegated the power to fix minimum wages for the district or group of districts. The effect in respect of wages and hours, is to subject the dissentient minority, either of producers or miners or both,

to the will of the stated majority, since by refusing to submit, the minority at once incurs the hazard of enforcement of the drastic compulsory provisions of the act to which we have referred. To 'accept,' in these circumstances, is not to exercise a choice, but to surrender to force.''

The measures employed in the National Industrial Recovery Act and the President's Reemployment Agreement to procure, obtain or induce assent are the same in principle as the measures held to be coercive in *United States v. Butler, supra,* and *Carter v. Carter Coal Co., supra.*

▇ We can not agree that the objection that the Reemployment Agreement was induced by coercion may not be made by demurrer. The coercion is apparent on the face of the statute pursuant to which the agreement was drawn and upon the face of the agreement itself.

The opinion in *United States v. Butler, supra,* is based upon ''the coercive purpose and intent of the statute.'' That the respondent was threatened with a boycott and with the imposition of a compulsory code, appears on the face of the statute and the agreement. The argument that some individuals and corporations would not enter into the agreement is met by the following observation from the opinion in *United States v. Butler, supra:*

''The coercive purpose and effect of the statute is not obscured by the fact that it has not been perfectly successful.''

The allegation that one voluntarily entered into an agreement means no more and means the same thing as the allegation that he entered into an agreement.

▇ Nor can we agree with counsel for appellant that the complaint states a cause of action upon oral promises by respondent to appellant and his assignors

that respondent would pay them the same wages per day and per week that they had received for several weeks prior to August 1, 1933, notwithstanding reduction in hours of employment agreed to in the President's Reemployment Agreement with the respondent.

The difficulty confronting appellant is the fact that the complaint does not allege the breach of any oral promise. The only agreement claimed to have been extended was the Reemployment Agreement, and the only breach of which appellant complains is breach of "said agreement and its extension."

The alleged oral promise, in so far as it might otherwise have tended to bind respondent, is invalid by reason of coercion. After all, it is the same undertaking as that alleged to be embodied in the President's Reemployment Agreement.

Appellant and his assignors could not rely upon a promise secured from the promisor by the duress of a third person if appellant and his assignors had knowledge, or were charged with knowledge, of the duress. Williston on Contracts, §1625. Appellant and his assignors had knowledge, or were charged with knowledge, of the duress, because the alleged oral promise refers to the Reemployment Agreement, which charges appellant and his assignors with knowledge of the coercive provision of the National Industrial Recovery Act.

■■■ Respondent is not estopped to assert that the Reemployment Agreement and the acts incidental to it were induced by duress. There can be no ratification "while the fear or undue influence which operated to induce the original transaction is still effective." Williston on Contracts, § 1623. The coercion did not cease until the statute was declared invalid in May, 1935, in *Schechter Poultry Corp. v. United States,* 295 U. S. 495, 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947.

We have not overlooked *James v. Sartin Dry Cleaning Co.,* 181 S. E. (N. C.) 341, which is not out of harmony with the position of this court respecting the third party beneficiary doctrine. That case, however, is not apposite. That the determinative question—invalidity of the agreement because procured by coercion —was not raised or considered in *James v. Sartin Dry Cleaning Co., supra,* clearly appears from an examination of that opinion, which reads as follows:

"Civil action 'for $200.00 due by back salary,' instituted in a court of a justice of the peace; dismissed in the court of first instance; tried de novo on appeal to the superior court.

"Plaintiff testified that he worked for defendant in 1933 as a 'dry cleaner' at a wage less than that stipulated in the 'President's Re-employment Agreement,' made pursuant to section 4(a) of the National Industrial Recovery Act, 15 USCA §704(a), voluntarily signed by defendant; and he sues to recover the difference between what he was paid and what he alleges the defendant agreed with the President to pay him for the time he was employed. This difference, plaintiff contends, really amounted to $240, but he only seeks to recover $200.

"Plaintiff says he was first paid $6 a week, later $9 a week; whereas, under the terms of the President's Re-employment Agreement, relative to hours and wages, he should have been paid not less than $12 a week, or 30 cents an hour for a 40-hour week. 'I received $6.00 a week until about three weeks before Christmas, and from that time I received $9.00 a week until the Saturday before Christmas when I got drunk and lost my job.' Suit was instituted May 26, 1934.

"The defendant, on the other hand, offered evidence tending to show that the plaintiff was not a 'dry cleaner,' but a general utility boy, engaged on part-time basis, and that the schedule of wages paid him was accordant with the terms of the President's Re-employment Agreement.

"The jury awarded the plaintiff $20.

"Judgment on the verdict, from which the defendant appeals, assigning errors. . . .

"[1] As the principal sum demanded in the complaint (summons) does not exceed $200, the justice of the peace had jurisdiction of the action. C. S. §1475; *Brantley v. Finch,* 97 N. C. 91, 1 S. E. 535; *Brock v. Scott,* 159 N. C. 513, 75 S. E. 724.

"[2] The matter is likewise cognizable in the courts of this state, the jurisdiction of the federal courts not having been made exclusive either by the Constitution or act of Congress. *Claflin v. Houseman,* 93 U. S. 130, 23 L. Ed. 833; *Robb v. Connolly,* 111 U. S. 624, 4 S. Ct. 544, 28 L. Ed. 542; *Mondou v. New York, N. H. & H. R. Co.,* 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44.

"[3] That the plaintiff is entitled to sue upon the 'President's Re-employment Agreement,' voluntarily signed by the defendant, either in equity, under the doctrine of subrogation, or at law, as upon a contract made for the benefit of a third person, is fully established and supported by the decisions in this jurisdiction. *Rector v. Lyda,* 180 N. C. 577, 105 S. E. 170, 21 A. L. R. 411; *Gorrell v. Greensboro Water Supply Co.,* 124 N. C. 328, 32 S. E. 720, 46 L. R. A. 513, 70 Am. St. Rep. 598; *Baber v. Hanie,* 163 N. C. 588, 80 S. E. 57, 12 A. L. R. 1518.

"[4] It is said in some of the cases that the plaintiff occupies the position of a 'donee beneficiary,' or, at least, that he is no less advantageously circumstanced. *First Carolinas Joint Stock Land Bank v. Page,* 206 N. C. 18, 173 S. E. 312. See annotations 81 A. L. R. 1271, and 95 A. L. R. 42, 43.

"[5] The benefit, inter alia, which defendant derived from others in the industry signing similar agreements was sufficient consideration to make it enforceable. *Fryns v. Fair Lawn Fur Dressing Co.,* 114 N. J. Eq. 462, 168 A. 862; *Greenville Supply Co. v. Whitehurst,* 202 N. C. 413, 163 S. E. 446; *Rousseau v. Call,* 169 N. C. 173, 85 S. E. 414; *Trustees of Baptist Female University v. Borden,* 132 N. C. 476, 44 S. E. 47, 1007; *Pipkin v. Robinson,* 48 N. C. 152; *New Jersey Ortho-*

*paedic Hospital & Dispensary v. Wright,* 95 N. J. Law, 462, 113 A. 144. See 60 C. J. 956.

"[6] While the jury rejected most of plaintiff's testimony and might well have found against him on the merits of the case—it appearing that he was strongly contradicted as to the facts—still there is some evidence to support the verdict, and the trial court declined to set it aside as contrary to the weight of the evidence. *Goodman v. Goodman,* 201 N. C. 808, 161 S. E. 686.

"No action or ruling of the court has been called to our attention which we apprehend should be held for reversible error. The verdict and judgment will be upheld."

The judgment is affirmed.

STEINERT, C. J., MAIN, BEALS, HOLCOMB, GERAGHTY, and ROBINSON, JJ., concur.

TOLMAN, J., dissents.

BLAKE, J. (dissenting)—As against demurrer, a complaint is good if it states a cause of action on any theory. *Isaacs v. Holland,* 4 Wash. 54, 29 Pac. 976; *Damon v. Leque,* 14 Wash. 253, 44 Pac. 261; *Peterson v. Pantheon Lumber Co.,* 62 Wash. 189, 113 Pac. 562; *Harding v. Ostrander R. & Timber Co.,* 64 Wash. 224, 116 Pac. 635; *White Bros. & Crum Co. v. Watson,* 64 Wash. 666, 117 Pac. 497, 44 L. R. A. (N. S.) 254; *Hughes v. McVay,* 113 Wash. 333, 194 Pac. 565, 14 A. L. R. 681; *Greenwood v. International Harvester Co.,* 122 Wash. 603, 211 Pac. 727; *Blanchard v. Golden Age Brewing Co.,* 188 Wash. 396, 63 P. (2d) 397; *Eden v. Northwest Brewing Co.,* 188 Wash. 701, 63 P. (2d) 418. The two cases last cited afford a striking example of the application of the rule. The complaints in the two cases were in all essential respects identical. In the *Eden* case, the sufficiency of the complaint was directly involved. The court disposed of the case sum-

marily with a *per curiam* opinion resting the decision on the *Blanchard* case. Of the complaint, the court in the *Blanchard* case said:

"The complaint was drawn, in large part, upon the theory that the action of the defendant brewing companies and the teamsters' union was in violation of the brewers' code, above mentioned, in that the brewery workers were denied the right to select their own representatives and through them to deal with their employers. In addition to that, however, the complaint alleged that, although the relations of the brewery workers with their employers had been harmonious in every respect, the teamsters' union, by threats of strikes and boycotts, and for the purpose of procuring the discharge of the brewery workers, had coerced the defendant brewing companies into demanding that the brewery workers should join the teamsters' union or else suffer the loss of their jobs by being discharged; and also alleged that, unless restrained, the demands of the teamsters' union would, by the same means, be carried into effect. It was further alleged that the brewing trade was the sole means of livelihood of the brewery workers and that it was the intention of the teamsters' union to blacklist them and prevent them from securing employment in their trade anywhere in Spokane."

In other words, notwithstanding a casual reading of the complaint would lead one to believe the action was wholly predicated on the National Industrial Recovery Act, the court found sufficient allegations to sustain a bill in equity for injunctive relief.

If the rule were applied with equal liberality in the instant case, there could not be any doubt as to the sufficiency of the complaint. For, wholly apart from the allegations with respect to the President's Reemployment Agreement, the complaint alleges that respondent entered into an oral contract with appellant and his assignors with respect to hours of employment and wages to be paid, and that pursuant to such agree-

ment he and his assignors carried on their labors. The majority dismiss this phase of the complaint in the following language:

"Nor can we agree with counsel for appellant that the complaint states a cause of action upon oral promises by respondent to appellant and his assignors that respondent would pay them the same wages per day and per week that they had received for several weeks prior to August 1, 1933, notwithstanding reduction in hours of employment agreed to in the President's Reemployment Agreement with the respondent.

"The difficulty confronting appellant is the fact that the complaint does not allege the breach of any oral promise. The only agreement claimed to have been extended was the Reemployment Agreement, and the only breach of which appellant complains is breach of 'said agreement and its extension.'

"The alleged oral promise, in so far as it might otherwise have tended to bind respondent, is invalid by reason of coercion. After all, it is the same undertaking as that alleged to be embodied in the President's Reemployment Agreement."

Plainly, this language draws all inferences against the pleading and none in favor of it. The sufficiency of the complaint should be measured by the rule as stated in *Isaacs v. Holland, supra:*

"The averments of this pleading are vague and indefinite, and it is defective in other respects; yet, when bolstered by the rule of liberal construction commanded by the code, we think we discern a cause of action. A suitor is no longer to be turned out of court, if by making all reasonable intendments in his favor enough can be seized hold of in his pleadings to show that he has rights which ought to be enforced. He may be required on motion to conform his statement to the rules of good pleading, and if he refuse, may be turned out of court; but as against a demurrer, the office of which is to raise a substantial issue on the law of the case, and not on the law of practice and pleading, evidentiary facts, and even inferences from averments

amounting to mere conclusions of law, will be consid-ered in his favor.''

The following sentence from the above quotation from the majority opinion is of more than passing interest: ''The alleged oral promise, in so far as it might otherwise have tended to bind respondent, is invalid by reason of coercion.'' What coercion? Certainly not the fear of penalties provided for in the National Industrial Recovery Act. They could not be imposed for the breach of private contracts. If this complaint were here setting up the oral contract alone, without reference to the President's Reemployment Agreement, it could not possibly be said to be coercive. The allegations with respect to this oral contract are to be considered without reference to the allegations concerning the President's Reemployment Agreement. The latter should be treated as mere surplusage—as though they were not contained in the complaint at all. *Eden v. Northwest Brewing Co., supra; Isaacs v. Holland, supra.*

Furthermore, duress, like fraud, is never presumed. One seeking to escape the consequences of his contract by reason of duress has the burden of proving it by evidence clear and satisfactory. *Cornwall v. Anderson,* 85 Wash. 369, 148 Pac. 1; *Bair v. Spokane Savings Bank,* 186 Wash. 472, 58 P. (2d) 819.

The majority also say: ''The difficulty confronting appellant is the fact that the complaint does not allege the breach of any oral promise.'' Again the inference is against the pleading, while the rule of construction, as stated in *White Bros. & Crum Co. v. Watson, supra,* is:

''It will be noted that there is no direct allegation that the point of diversion, either as originally located or as now proposed, is upon the respondents' land. This is urged as one reason that the demurrer was properly sustained. The inference, however, from a

reading of the whole amended complaint, is that both of these points and the site of the proposed dam are upon respondents' land. In the absence of a motion to make the amended complaint more specific in these particulars, the demurrer should not have been sustained on this ground.''

The very bringing of the action to recover wages is sufficient to justify an inference of a breach of the contract set up in the complaint.

I dissent.

