**JEFFERY–DE WITT INSULATOR CO. v. NATIONAL LABOR RELATIONS BOARD.***

No. 4066.

Circuit Court of Appeals, Fourth Circuit.

June 16, 1937.

F. M. Livezey, of Huntington, W. Va., for petitioner.

Philip Levy, Atty., and Charles Fahy, Gen. Counsel, National Labor Relations Board, both of Washington, D. C. (Rob-

ert B. Watts, Associate Gen. Counsel, and Mary L. Schleifer and William R. Walsh, Attys., National Labor Relations Board, all of Washington, D. C., on the brief), for respondent.

Before PARKER, NORTHCOTT, and SOPER, Circuit Judges.

PARKER, Circuit Judge.

This case arises upon a petition of the Jeffery-DeWitt Insulator Company for review of an order of the National Labor Relations Board. The company is a West Virginia corporation engaged in the manufacture, sale, and distribution of insulators at Kenova, W. Va. The raw materials which it uses are obtained in large part from other states and are shipped to it in interstate commerce, 85 per cent. of the raw materials used by it in the 11-month period ending November 30, 1935, having been obtained from states other than West Virginia. Its product is sold and distributed throughout the Union and in several foreign countries, 99 per cent. thereof having been thus sold outside the state of West Virginia during the eleven-month period mentioned. Its gross sales during this period amounted to $230,854.75. It maintains sales offices at Kenova, New York, and Chicago, and makes sales through approximately 20 regularly appointed sales agents located throughout the United States. In 1935 it employed at its Kenova plant between 82 and 166 persons, the number employed at any particular time depending upon its operations.

In September 1933, Local Union No. 455, United Brick and Clay Workers of America, affiliated with the American Federation of Labor, was organized at the company's plant for the purpose of collective bargaining, and the company recognized it as the representative of its employees and bargained with it until June 20, 1935. Approximately 75 members of this union were working in the company's plant on June 15, 1935, when a strike was called. On the preceding day 89 persons were shown by the pay roll to be in the employment of the company. Persons on the rolls of the company were considered as employees although not actually at work; and there were 166 of these, of whom 129 were members of the union. A clear majority of the employees, therefore, were unquestionably members of the union, which was found by the Board to constitute a unit appropriate for the purpose of collective bargaining.

Disputes arose between the company and the union in October, 1933, and March, 1934, which were settled as the result of efforts on the part of conciliators of the Department of Labor of the United States government. Another dispute arose in 1935 as a result of the demand of the union for a union shop, the recognition of certain seniority rights on the part of employees, and a provision for the checkoff, or deduction by the company from the wages of employees of the fees and dues of the union. The company declined to accede to the demands of the union and a strike was declared on June 15th, which resulted in the closing down of the plant. Efforts to compromise the matters in difference on June 16th and 20th failed of result; and on the latter date the company reopened with a greatly depleted force without arriving at an adjustment. From June 20th to July 15th the strike continued and the plant of the company was operated far below normal or seasonal capacity. On July 15th a conciliator of the United States Department of Labor and an inspector of the West Virginia Department of Labor endeavored to persuade the company to enter upon negotiations with representatives of the union for the purpose of adjusting the matters in difference, but the company declined to do so. The Board in its report found the following with respect to its refusal: "The record convinces us that after the strike began, the respondent did not desire to reach an agreement with its striking employees. In addition to telling the Conciliators that he would not meet the Committee because further meetings would be useless, Stinson told them that he would not meet the Committee because the situation was working itself out nicely, and because the respondent had no further duty to meet the strikers inasmuch as, by striking, they had ceased to be employees of the respondent. The record shows clearly that a current labor dispute existed on July 16, 17, 18 and about August 1; thus, at all such times, the strikers were still employees within the meaning of the Act. These statements of Stinson's clearly show that the respondent no longer regarded itself as an employer whose relation with its employees were governed by the orderly procedure required by the Act. At the hearing, Stinson admitted that his statement to the strikers on June 20, that he

wished to deal with them as 'J-D employees', meant that he did not wish to deal with them through a union. This merely reinforces our conviction that, regardless of what the result of a meeting with the Committee might have been, the respondent no longer desired, or considered itself required, to use the procedure of collective bargaining as a means of reaching an agreement; and that the respondent had finally determined to seize the strike as a means of eliminating Local No. 455 as the bargaining agent of its employees. Consequently, the respondent's refusal to negotiate with the strikers through the Conciliators was merely the final expression of its determination not to bargain collectively."

Upon refusal of the company to enter into negotiations with the union, the latter filed complaint with the Board charging that the company was guilty of unfair labor practices within the meaning of the Wagner-Connery Labor Relations Act (29 U.S.C.A. § 151 et seq.) in refusing to bargain with the union as the representative of the employees on strike, and in discouraging membership in the union by discriminating against union members with regard to hire and tenure of employment. The Board found against the union and in favor of the company on the issue of discrimination but sustained the charge of refusal to bargain with the union as representative of the employees. It further found that the effect of the strike was to burden and obstruct interstate commerce and that the company by its refusal to bargain collectively with the union, "placed obstacles in the way of settling the strike and as a consequence was responsible for the continuance of the burden and obstruction to the free flow of commerce." It found that on November 26, 1935 the company was employing 58 wage earners, only 23 of whom had been employed by it prior to June 15, 1935, and, with respect to the relief to be accorded, said: "Under these circumstances no effective relief would be granted by merely ordering the respondent to bargain collectively. Since the respondent in refusing to bargain collectively on July 16, 1935, and thereafter, precluded the possibility of the strikers returning to work under an agreement which might have been reached at that time, we will also order the respondent to offer employment to its employees who were on strike on July 16 and who have not received sub-

stantially equivalent employment elsewhere, replacing, if necessary, the persons who were hired by the respondent for the first time on and subsequent to July 16, 1935."

The order as entered directed that the company cease and desist from refusing to bargain collectively with the union as representative of its employees, that upon request it bargain with the union as the exclusive representative of its employees "in respect to rates of pay, wages, hours of employment and other conditions of employment," and that it offer employment to its employees who were on strike on July 16, 1935, and who had not received substantially equivalent employment elsewhere "when the positions held by such persons on June 15, 1935 are not filled by persons who were first employed by respondent on and after July 16, 1935," placing all other employees who were on strike on a preferential list. In asking that the order be set aside, the company makes three contentions: (1) That members of the union were not employees within the protection of the act at the time of the alleged unfair labor practices; (2) that the company was not guilty of any unfair labor practices in refusing to negotiate further after an impasse had been reached in negotiations; and (3) that the alleged unfair labor practices did not burden commerce. Other contentions, going to the constitutionality of the act, have been virtually abandoned in view of the decision of the Supreme Court in National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 81 L.Ed. ——, and other National Labor Relations Board cases decided at the same time. (National Labor Relations Board v. Fruehauf Trailer Co., 57 S.Ct. 642, 81 L.Ed. ——; National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. ——; Washington, Va. & Md. Coach Co. v. National Labor Relations Board, 57 S.Ct. 648, 81 L.Ed. ——; Associated Press v. National Labor Relations Board, 57 S.Ct. 650, 81 L.Ed. ——.)

The contention that the Board was without jurisdiction to afford relief to the union, on the ground that members of the union were not employees at the time of the unfair labor practices complained of, proceeds upon the assumption that that relationship was severed when the employees continued on strike and refused to return to work when the company resumed operations on June 20, 1935, and that, as

this was prior to the passage of the Wagner-Connery Labor Relations Act on July 5, 1935 (29 U.S.C.A. § 151 et seq.), the provisions of that act are not effective to preserve the rights of employees as a basis for action on the part of the Board. We think, however, that this takes too narrow a view both of the rights of employees and of the purpose of the statute. It has long been recognized by the law, as well as in common understanding, that the relationship existing between employer and employee is not necessarily terminated by a strike. As was well said by Judge Baker, speaking for the Circuit Court of Appeals of the Seventh Circuit, in Michaelson v. United States, 291 F. 940, 942: "In the case of a controversy over wages and conditions of work in a private and local industry, we agree with counsel for plaintiffs in error that a 'strike' does not of itself terminate the relation of employer and employee. A controversy arises, and the employees, then at work, say to their employer: 'We shall stop work until you are in what we may consider a more reasonable state of mind. We shall deprive you of our labor as a legitimate means of exerting economic pressure to induce you to yield. If we do go out, we shall remain at hand, ready to negotiate with you concerning fair wages and working rules, and ready to return to work the moment we can agree.' If, by reason of a failure to agree, the employees stop their work, a 'strike' is on. They are no longer working and receiving wages; but, in the absence of any action other than above indicated looking to a termination of the relationship, they are entitled to rank as 'employees,' with the adjective 'striking' defining their immediate status."

In Iron Molders' Union v. Allis-Chalmers Co. (C.C.A.7th) 166 F. 45, 52, 20 L. R.A.(N.S.) 315, the matter is thus put by Judge Grosscup in his concurring opinion, viz.: "A strike is cessation of work by employees in an effort to get for the employees more desirable terms. A lock out is a cessation of the furnishing of work to employees in an effort to get for the employer more desirable terms. Neither strike nor lock out completely terminates, when this is its purpose, the relationship between the parties. The employees who remain to take part in the strike or weather the lock out do so that they may be ready to go to work again on terms to which they shall agree—the employer remaining ready

to take them back on terms to which he shall agree. Manifestly, then, pending a strike or a lock out, and as to those who have not finally and in good faith abandoned it, a relationship exists between employer and employee that is neither that of the general relation of employer and employee, nor again that of employer looking among strangers for employees, or employees seeking from strangers employment."

And in Tri-City Central Trades Council v. American Steel Foundries (C.C.A. 7th) 238 F. 728, 733, Judge Evans thus dealt with the same question: "Plaintiff's further contention that the defendants were not its employees at the time of the strike, and therefore had no right to picket or persuade by argument those about to enter plaintiff's employment, is not well taken. It is true a striker is not technically an employee. The relation of employer and employee is temporarily suspended during a strike. The situation has been described as: 'A relationship between employer and employee that is neither that of a general employer and employee, nor that of employer and employee seeking work from them as strangers.' Neither strike nor lockout fully terminates during the strike the relationship between the parties."

And the same view was taken by Judge Killits in Dail-Overland Co. v. Willys-Overland, Inc. (D.C.) 263 F. 171, 188, where, in interpreting the word employees as used in section 20 of the Clayton Act, 29 U.S.C.A. § 52, he said: "As long as conditions are such that what is called a 'settlement' might seem reasonably possible between the company and its late workmen, the latter, it seems, should be considered 'employees,' within the meaning of that term in the Clayton Act. But when the controversy has reached a practical end, there is no reason why the term 'employee' should not be held to its ordinary meaning of one who actually works for hire for another and under the latter's control."

The same view has been taken by a number of state courts. Thus in Fryns v. Fair Lawn Fur Dressing Co., 114 N.J.Eq. 462, 168 A. 862, 865, the question was whether employees on strike were entitled to the provisions of a contract which had been negotiated under the National Industrial Recovery Act (48 Stat. 195) for the benefit of employees. The court said: "This enactment, embodied in the contract,

gave complainants, while they were employees of defendant and constituted a majority of such employees engaged in rabbit dressing, the right to organize themselves as members of the Needle Trades Union and the right, if they so chose, to bargain collectively with defendant through the agents of that union. Defendant could not, without breach of its agreement, coerce them into a different organization or compel them to accept as their representative an agent of the Fur Workers' Union. *It is true that complainants went on strike, but, even while on strike, they remained, for the present purpose, employees of defendant."* (Italics ours.)

In State v. Personett, 114 Kan. 680, 220 P. 520, 524, in sustaining a conviction under the Kansas Industrial Court Act, the Supreme Court of that state said: "It may be noted that a strike is not a quitting of employment. The man who goes out on a strike does not profess to quit his employment. He still lays claim to his position and asserts a right to go back and take it at more advantageous terms."

In Uden v. Schaefer, 110 Wash. 391, 188 P. 395, 396, 11 A.L.R. 1001, the distinction between a strike and a quitting of work is thus drawn by the court: "In the common acceptation of the term, it is not a 'strike' for the workmen of an employer to quit his employment and go elsewhere, without any intention of returning; nor is it a 'strike' for workmen to refuse to enter into the employment of a particular contractor. A 'strike,' in such common acceptation, is the act of quitting work by a body of workmen for the purpose of coercing their employer to accede to some demand they have made upon him, and which he has refused."

See, also, Bayonne Textile Corporation v. American Federation of Silk Workers, 116 N.J.Eq. 146, 172 A. 551, 92 A.L.R. 1450; Densten Hair Co. v. United Leather Workers' International Union, 237 Mass. 199, 129 N.E. 450, 451; Greenfield v. Central Labor Council, 104 Or. 236, 192 P. 783, 207 P. 168.

Irrespective of the statute, therefore, the strike did not of itself result in a complete severance of the relationship which had been established between the company and its employees. They were employees on strike because of the labor dispute which existed; and this situation was not materially changed by the resumption of operations on June 20th, even though the company announced that those employees who desired to work must go to work on that day. Cf. Densten Hair Co. v. United Leather Workers' International Union, supra. The strike continued and resulted for a considerable period in greatly hampering the operations of the company. The June factory pay roll was 67 per cent. below that of May and the August pay roll 50 per cent. below it. No inventories were taken at the end of the calendar months June, July, and August in accordance with the company's custom because of the disorganized state of its business. The existence of the dispute between the company and its employees was recognized by the Department of Labor of both the state and the nation, and conciliators came upon the scene and attempted to adjust it. The company recognized its existence when its general manager stated to the conciliators that it "would be very fine" "for the men to call the strike off and come back to work."

It is not necessary to go into detail as to the respective rights of the company and its employees after the resumption of work on June 20th or to decide at precisely what point the relationship between a company and its striking employees is completely terminated so as not to be further subject to the regulatory power of Congress over the interstate commerce in which the company is engaged. It is sufficient for the case in hand that at the time the conciliators came upon the scene the strike was still in progress and a labor dispute within any fair meaning of that term existed between the company and its striking employees.

To such a situation we think the act was clearly applicable. It provides that "the term 'employee' * * * shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute * * * and who has not obtained any other regular and substantially equivalent employment." Section 2 (3), 29 U.S.C.A. § 152 (3). And the term "labor dispute" is defined as including "any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee." Section 2 (9), 29 U.S.C.A.

§ 152 (9). Here there was clearly a current labor dispute within the above definition and the striking employees were persons whose work had ceased because of it. It is an unfair labor practice within the meaning of the act for an employer to refuse to bargain collectively with representatives of his employees. Section 8 (5), 29 U.S.C.A. § 158 (5). The Board is empowered to prevent any person from engaging in an unfair labor practice affecting commerce as defined in the act; and it is required to take jurisdiction of a labor dispute when it is charged that any person has engaged in an unfair practice within its meaning. Section 10 (a) (b), 29 U.S.C.A. § 160 (a) (b).

█ It is argued, however, that the act, which was not passed until July 5th, must be given a prospective operation and not be applied to disputes which had their origin prior to its passage. It is a sufficient answer to this that the dispute was current at the time of the passage of the act and that, under the principles of law theretofore recognized, the relationship between the company and its striking employees had not been so completely terminated as to have no further connection with the company's business or the commerce in which it was engaged. The action of the Board was not predicated upon anything that occurred prior to the passage of the act, but upon an unfair labor practice which occurred ten days after its effective date, i. e., upon the refusal to bargain collectively with the representative of the employees, which occurred July 15th. The mere fact that the labor dispute had commenced prior to the passage of the act does not withdraw the parties or the dispute from the regulatory power of Congress as to acts subsequently occurring. The act is highly remedial in character and is entitled to a broad and liberal construction; and it is hardly to be presumed that Congress should have intended its provisions, designed as they are for the promotion of industrial peace, to have no application to pending disputes. Certainly the unfair labor practices forbidden by the act would tend to prolong such disputes, and there was just as much reason to forbid them in existing labor disputes as in disputes which might subsequently arise. So long as there was an existing relationship between the company and its striking employees affecting commerce as defined in the act, this relationship was subject to the regulatory power of Congress; and the act is given a prospective operation when applied to subsequent unfair labor practices affecting such relationship, notwithstanding they may have occurred in the course of a labor dispute which had its origin before the act was passed. Cf. George v. City of Asheville (C.C.A.4th) 80 F.(2d) 50, 55, 103 A.L.R. 568.

█ The company's second contention is that it was not guilty of an unfair labor practice in refusing to bargain with the union on and after July 15th, for the reason that efforts to bargain with it prior to June 20th had resulted in failure and an impasse in the negotiations had been reached. The answer to this is that nearly a month of "cooling time" had elapsed since the negotiations of June 15th to 20th, the status of the controversy had undergone considerable change as a result of the operation of the plant, the striking employees after nearly a month of idleness were doubtless willing to make concessions to compromise the matters in difference, and conciliators had arrived upon the scene for the purpose of trying to secure an adjustment. It is true that the act does not require the parties to agree but merely to negotiate with each other; but it is based upon the idea that negotiations honestly entered into will generally result in the settlement of differences, and commands negotiation for that reason. Statistics show the reasonableness of the hope upon which it proceeds.[1] Of 14,889 disputes handled by the United States Conciliation Service between 1915 and 1936, 11,421 disputes, or over 76 per cent., were satisfactorily adjusted. During the fiscal year ending June 30, 1936 the Conciliation Service intervened in 1,012 disputes and secured settlement of 805 of them. The experience under the Railway Labor Act (as amended, 45 U.S.C.A. § 151 et seq.) demonstrates that negotiation is the most effective method yet devised of settling differences between employer and employee and avoiding industrial conflict. Virginian Ry. Co. v. System Federation No. 40, 57 S.Ct. 592, 598, 81 L.Ed. 789.

Whether the refusal to negotiate further in this case was unreasonable under the

---

[1] See Annual Report of Secretary of Labor for fiscal year ending June 30, 1936, pages 23 and 26.

circumstances of the case and on that account an unfair labor practice, was a question of fact as to which we are bound by the finding of the Board, if it has substantial support in the evidence. We think that it has such support. We cannot say that the failure of negotiations to result in agreement in June so clearly precluded the possibility of agreement in July under the changed circumstances then existing that the finding by the Board, to the effect that the refusal to negotiate was unreasonable and grew out of a desire to be rid of the union, is unsupported by the record. On the contrary we think that the finding is a reasonable one upon the facts. If an employer in the presence of a strike could rid himself of the obligation to negotiate by declaring further negotiations to be useless and refusing to recognize as employees those failing to return to work on his terms, the statute enjoining collective bargaining would largely fail of its purpose. We do not think that it can be brushed aside so easily.

■ The company's third contention is ruled against it, we think, by the decision of the Supreme Court in the case of National Labor Relations Board v. Friedman-Harry Marks Clothing Co., 57 S.Ct. 645, 81 L.Ed. ——. The relationship of the company's business to interstate commerce cannot be distinguished on any principle with which we are familiar from the relationship of the business involved in the Friedman-Harry Marks Clothing Company Case. Both with respect to its purchase of raw materials and its sale of finished product, the company is engaged in interstate commerce; and its share of this commerce will be substantially burdened and interfered with by strikes among its employees, even though these employees are engaged in manufacturing. It is within the power of Congress, therefore, to regulate the relationship between the company and its employees so as to avoid the burden and interference. National Labor Relations Board v. Jones & Laughlin Steel Corporation, 57 S.Ct. 615, 81 L.Ed. ——.

For the reasons stated, the petition of the company to set aside the order of the Board will be denied, and decree will be entered enforcing it pursuant to the provision of section 10 (f) of the act, 29 U.S.C.A. § 160 (f).

Decree accordingly.

NORTHCOTT, Circuit Judge (dissenting).

I do not agree with the majority of the court in the conclusions stated in the opinion. Disputes had arisen between the company and the union in October, 1933, and March, 1934. These disputes were settled. Again on June 15, 1935, the union declared a strike and on June 20, 1935, the employees were notified positively that their demands would not be met and the company began operation of the plant with employees other than the strikers. While the business was carried on with a greatly depleted force the plant was running, and gradually getting back to a normal condition.

The law under which the National Labor Relations Board acted was passed by the Congress of the United States to become effective July 5, 1935. At the time the law went into effect there was no current labor dispute at the plant of the company and nothing that the law could affect with respect to the already settled dispute between the company and its former employees. This dispute had been finally and definitely settled on June 20.

The employees had made certain demands and gone on a strike. These demands were rejected by the company on June 20 and the plant reopened without the striking employees. When the law became effective there was no dispute that would justify any action on the part of the Labor Board. The finding of the Board to the effect that there was such a dispute has no support in the evidence as shown in the record in the case and we are not bound by such a finding unless there is substantial evidence to support it.

It cannot be the law that strikes will be regarded as settled only when the strikers admit that they are settled or that no action by an employer will terminate a strike no matter how definite or positive such action may have been. Such a holding is unfair to the employer and cannot, in my opinion, be justified. Certainly Congress can never have intended, in the passage of the act, that consideration be given to one party only to a controversy. Both sides should receive fair consideration.

There was no current labor dispute when the act became effective and there was nothing to which the jurisdiction of the Board could possibly attach. The order of the Board was without authority and based upon no substantial evidence.